UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re    )    Case No. 09-21481-BKC-AJC

)    Chapter 7

FONTAINEBLEAU LAS VEGAS    )    Jointly Administered
HOLDINGS, LLC, et al.,

)

Debtors.

)

---

**JOINT MOTION TO (1) APPROVE COMPREHENSIVE
SETTLEMENT AGREEMENT REGARDING DISTRIBUTION
OF ICAHN SALE PROCEEDS AND RESOLUTION OF RELATED
DISPUTES AND PROCEEDINGS AND (2) APPROVE BAR ORDERS**

> **ANY INTERESTED PARTY WHO FAILS TO FILE AND SERVE A
> WRITTEN RESPONSE TO THIS JOINT MOTION ON OR BEFORE
> NOVEMBER 5, 2013 SHALL, PURSUANT TO LOCAL RULE 9013-
> 1(D), BE DEEMED TO HAVE CONSENTED TO THE ENTRY OF AN
> ORDER IN THE FORM ATTACHED TO THIS JOINT MOTION,
> INCLUDING THE BAR ORDERS CONTAINED THEREIN. ANY
> SCHEDULED HEARING MAY THEN BE CANCELED.**

Pursuant to Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, and

Sections 105 and 363 of the United States Bankruptcy Code, Soneet R. Kapila, in his

capacity as Chapter 7 Trustee for the Debtors (the "Trustee"),[1] Wilmington Trust, N.A., as

administrative agent and disbursement agent ("Wilmington"), the Term Lenders,[2] those

Statutory Lienholders[3] signing this Joint Motion, the Title Companies,[4] and the Turnberry

---

[1] All capitalized terms not defined in this Joint Motion shall have the same meaning ascribed to them in the Comprehensive Settlement Agreement unless otherwise provided for herein.

[2] The Term Lenders are identified in Exhibit D to the Comprehensive Settlement Agreement.

[3] The Comprehensive Settlement Agreement defines Statutory Lienholders as the "Holders of asserted statutory liens (excluding any Turnberry Parties (as defined below)) who are plaintiffs or defendants, or their successors in interest including JMB Capital Partners Master Fund, L.P., in the proceedings listed on Exhibit A as *Priority Disputes in Bankruptcy Court (including certification to Nevada Supreme Court)*."

Parties[5] (collectively, the "Settlement Parties"), jointly move for the following:  (1) approval by this Court of the Comprehensive Settlement Agreement, attached hereto as *Exhibit 1*, regarding distribution of Icahn Sale Proceeds and resolution of related disputes and proceedings and the exhibits thereto, and (2) entry by this Court of the Approval Order, attached as *Exhibit 2*, which includes proposed bar orders against (a) the Beneficiaries under a Completion Guaranty, (b) the Statutory Lienholders, and (c) Wilmington and the Lenders under the Credit Agreement.[6]

The Comprehensive Settlement Agreement is the product of prolonged negotiations that date back to 2010 and that have included four separate two-day mediations attended by multiple parties held in Miami (twice), New York, and Las Vegas.  The Comprehensive Settlement Agreement, if approved, will resolve the outstanding disputes concerning the priority, allocation and distribution of the sale proceeds generated from the sale of the

---

[4] The Title Companies consist of the following entities:  Fidelity National Title Insurance Company, Fidelity National Title Insurance Company as successor by merger to Lawyers Title Insurance Corporation, Commonwealth Land Title Insurance Company, Commonwealth Land Title Insurance Company as successor by merger to Transnation Title Insurance Company, Alamo Title Insurance; Chicago Title and Trust Company, Chicago Title Insurance Company, Chicago Title Insurance Company as successor by merger to Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, and Security Union Title Insurance Company; and First American Title Insurance Company.

[5] The Comprehensive Settlement Agreement defines the Turnberry Parties as Jacqueline Soffer (together with Jeffrey Soffer, the "Soffers," and the Soffers, together with Turnberry Residential, TWC, FBR, Turnberry, and their respective present and former affiliates, owners, employees, officers and directors, the "Turnberry Parties," and each, a "Turnberry Party").

[6] The Title Companies are not a movant with respect to the proposed bar order against the Title Companies, or with respect to the proposed allocation of proceeds between the Resort Debtors and the Retail Debtors under the Comprehensive Settlement Agreement.  The Title Companies do not, however, object to the bar order nor to the allocation between the Resort Debtors and the Retail Debtors, and have required that the bar order be granted as a condition to the performance of the Title Companies' payment and other obligations under the Comprehensive Settlement Agreement and Title Companies/Lender Settlement Agreement.

Debtors' assets comprising the Fontainebleau Las Vegas Project (the "FBLV Project")[7] to Icahn Nevada Gaming Acquisition, LLC ("Icahn Nevada") in February 2010. The Comprehensive Settlement Agreement also resolves a number of related disputes and proceedings, including: a) the Statutory Lienholders' appeal of various orders entered by this Court, which resulted in the entry of an order by the District Court and a subsequent appeal by numerous parties to the Eleventh Circuit; and b) disputes arising from the interpretation and enforcement of a completion guaranty provided by Turnberry Residential Limited Partner, L.P. ("Turnberry Residential") for the benefit of Wilmington, the Term Lenders, and other parties.

In order to effectuate the Comprehensive Settlement Agreement, the proposed Approval Order provides for three bar orders. As demonstrated below, the bar orders are appropriate under applicable law and the record before this Court.

For the reasons stated below, the Settlement Parties respectfully request that this Court grant this motion (the "Joint Motion"), approve the Comprehensive Settlement Agreement, and enter the Approval Order in the form attached as *Exhibit 2*.

### Background

1.     On June 9, 2009 (the "Petition Date"), Fontainebleau Las Vegas, LLC, Fontainebleau Las Vegas Holdings, LLC and Fontainebleau Capital Corp. (collectively, the "Resort Debtors") filed voluntary petitions in this Court for protection under Chapter 11 of the Bankruptcy Code.

---

[7] The "FBLV Project" as used in the Joint Motion refers to the proposed development and construction of a casino hotel resort with gaming, lodging, convention, and entertainment amenities in Las Vegas, Nevada, which was never completed.

2.     Thereafter, this Court entered twelve cash collateral orders (the "Cash Collateral Orders") which, either with the consent of the Term Lenders or (in one instance) over their objection, expressly authorized the Debtors to use, subject to a number of terms and conditions, approximately $18 million of the Term Lenders' cash collateral (the "Used Cash Collateral") to fund expenses, including fees of estate professionals and construction-related goods and services.

3.     Shortly after the Petition Date, the Statutory Lienholders appeared in the bankruptcy cases and argued that their statutory liens were, under Nevada law, entitled to priority over the liens of the Term Lenders.  Based on that legal position, the Statutory Lienholders objected to those Cash Collateral Orders which granted a priming lien to the Term Lenders as adequate protection for the use of their cash collateral.

4.     On November 23, 2009, in connection with a sale of substantially all of the Debtors' assets to Icahn Nevada, this Court entered an interim financing order (ECF No. 1052) authorizing the Debtors to borrow in excess of $50 million, of which proceeds in the amount of approximately $18 million were earmarked for repayment of the Used Cash Collateral to the Term Lenders and an additional approximately $8 million were earmarked for payment of the fees and costs of estate professionals for services rendered during the Debtors' Chapter 11 cases.  Subsequently, this Court entered a final financing order (ECF No. 1401) (together with the interim financing order, the "Financing Orders").

5.     On November 25, 2009, Fontainebleau Las Vegas Retail, LLC, Fontainebleau Las Vegas Retail Parent, LLC and Fontainebleau Las Vegas Retail Mezzanine, LLC (collectively, the "Retail Debtors") filed petitions in this Court for protection under Chapter 11 of the Bankruptcy Code.  The primary asset of the Retail Debtors consists of "air rights"

4

that, in order to have any potential value, required the completion and opening of the FBLV Project, which never occurred. The cases of the Resort Debtors and the Retail Debtors (collectively, the "Debtors") are being jointly administered by this Court under Case No. 09-21481-BKC-AJC.

6.    On December 2, 2009, Wilmington commenced an adversary proceeding (Adv. Proc. No. 09-02480-AJC) against the Statutory Lienholders to determine, among other things, the validity, priority and extent of the liens of the Statutory Lienholders (the "Priority Litigation").

7.    The Statutory Lienholders appealed from the Financing Orders, as well as certain of the Cash Collateral Orders.

8.    On January 29, 2010, the Court entered an order (the "Sale Order") approving the sale of substantially all of the Debtors' assets to Icahn Nevada (ECF No. 1671).

9.    On February 18, 2010, pursuant to the Sale Order, the Debtors sold substantially all of their assets to Icahn Nevada, resulting in net sale proceeds of $100,606,539.89 (the "Icahn Sale Proceeds") (ECF No. 1746). The Icahn Sale Proceeds were placed in a segregated account, pending the resolution of disputes concerning the priority, allocation, and distribution of the Icahn Sale Proceeds. Among those disputes were the following:

- The Statutory Lienholders' position that their statutory liens asserted against the real property are entitled to priority over the liens of any lenders, including those asserted by Wilmington, the Term Lenders, and the Retail Lenders;

- The assertion by Wilmington and the Term Lenders that a substantial portion of the Icahn Sale Proceeds should be attributed to the value of the personal property sold by the Resort Debtors, in which the Statutory Lienholders did not assert any lien;

- The validity of warehouse liens asserted by QTS Logistics Inc. and Quality Transportation Services of Nevada, Inc. against any proceeds attributed to the personal property sold; and

- The allocation of the Icahn Sale Proceeds among the Resort Debtors on the one hand, and the Retail Debtors on the other hand.

10.     The Debtors' cases were converted to cases under Chapter 7 of the Bankruptcy Code on April 12, 2010 (ECF No. 1944).  By notice dated April 20, 2010, the United States Trustee appointed Soneet R. Kapila as Chapter 7 Trustee for the Debtors' Chapter 7 cases (ECF No. 1973).   Upon conversion of the Debtors' cases to Chapter 7, possession of the Icahn Sale Proceeds was transferred to the Trustee (ECF No. 2975).

11.     On July 14, 2010, the District Court issued an order (the "District Court Order"), reversing certain of this Court's Cash Collateral Orders and the Financing Orders. The Term Lenders, Aurelius, the Examiner, the Trustee and a multitude of professionals (collectively with those similarly situated, the "Professionals") impacted by the District Court Order filed timely appeals (the "Eleventh Circuit Appeal") to the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit").[8]

---

[8] Appeals were filed by the Term Lenders; Aurelius; Bilzin Sumberg Baena Price & Axelrod LLP; the Examiner and his professionals; the Trustee; Ernst & Young LLP; Fox Rothschild, LLP; Fulbright & Jaworski, L.L.P.; Genovese Joblove & Battista, P.A.; Marcum LLP; Brownstein, Hyatt, Farber Schreck; and Moelis & Company LLC.

12.     The Eleventh Circuit appointed a mediator, which led to the first two-day mediation session in Miami in November 2010, attended by the Settlement Parties. That mediation did not result in a settlement. However, based on the progress made during that mediation, the Settlement Parties, along with the Retail Lenders, engaged in a second voluntary two-day mediation session in New York in August 2011. The Settlement Parties made significant progress toward reaching a settlement but were unable to reach a final agreement.

13.     Following the August 2011 mediation, three significant events occurred. First, in November 2011, the court in the Completion Guaranty Litigation granted summary judgment in favor of Wilmington and against Turnberry Residential, paving the way for the subsequent entry of a judgment against Turnberry Residential in the amount of $100 million, which Turnberry Residential appealed. Wilmington thereafter commenced various proceedings in New York, Delaware and Florida to enforce that judgment. Second, in June 2012, oral argument was held before the Nevada Supreme Court on certain issues of Nevada law that had been certified by this Court. Third, the parties reached a settlement of the *Motion to Determine the Value of the Personal Property Sold to Icahn Nevada and to Allocate and Distribute Sale Proceeds.* ECF No. 3740.

14.     While the appeal process in the Completion Guaranty Litigation was running its course, and before the Nevada Supreme Court ruled, the Settlement Parties attended a third two-day mediation in September 2012, this time in Las Vegas. The Settlement Parties were continuing to negotiate towards settlement when the Nevada Supreme Court issued its ruling.

15.    Since that ruling, there was further activity in the various litigation proceedings.  Most notably, the parties to the Priority Litigation returned to this Court for further litigation and pleadings practice, resulting in an amended complaint from Wilmington followed by full briefing on motions to dismiss filed by the Statutory Lienholders and by one of the Turnberry Parties.  In addition, the Eleventh Circuit heard oral argument on the Eleventh Circuit Appeals.  Around that same time, the Statutory Lienholders filed a motion to enforce the District Court Order against Wilmington and the Term Lenders, which this Court denied without prejudice.  Finally, Turnberry Residential exhausted its appeal process in the Completion Guaranty Litigation.

16.    At the urging of the Trustee, on April 9-10, 2013, a fourth two-day settlement conference was held in Miami that was attended by, among other parties, the Settlement Parties.  At the conclusion of that mediation, the Settlement Parties reached an agreement in principle.  However, in the course of documenting the settlement, it became apparent that open issues remained with respect to the understanding of the Settlement Parties that required further resolution.  Following extensive negotiations, the Settlement Parties were able to resolve those open issues, leading to the execution of the Comprehensive Settlement Agreement that is the subject of this Joint Motion.

17.    In order to avoid the uncertainty, time, inconvenience, and expense of further litigation, the Settlement Parties have agreed to a comprehensive settlement regarding the priority, allocation, and distribution of the Icahn Sale Proceeds and the related disputes.  The Settlement Parties have memorialized the terms of their settlement in the Comprehensive Settlement Agreement, a copy of which is attached as *Exhibit 1* to this Joint Motion and is incorporated herein by reference.

## Summary of Settlement Terms[9]

18.     In summary, the Comprehensive Settlement Agreement provides as follows:

The settlement provides for the distribution by the Trustee of approximately $176,577,268.08

(the "Available Disbursement Funds"), whose sources consist of the following:  (a) the Icahn

Sale Proceeds which, as of October 1, 2013, are approximately $93,270,837.81;  (b)

$49,956,430.27 on deposit in Completion Guaranty Proceeds Account, to be paid by

Wilmington to the Trustee; and (c) $33,350,000.00 to be paid by the Title Companies.

19.     The Trustee will indefeasibly disburse funds, free and clear of liens, claims,

and interests, and not subject to rights of setoff, recoupment, or surcharge, except as provided

for in Section VI of the Comprehensive Settlement Agreement, to the following Parties from

the Available Disbursement Funds the following amounts subject to pro rata adjustment of

the amounts stated in Section 2.02 subsections (a) and (b) of the Comprehensive Settlement

Agreement to reflect variances in the Available Disbursement Funds:

(i)     To the Statutory Lienholders, the sum of $85,317,708.82 (the "Gross Statutory Lienholder Proceeds"), to be distributed at the times and in the manner prescribed by the terms of the Comprehensive Settlement Agreement.

(ii)     On the Effective Date, to Wilmington, the sum of $88,909,559.26.

(iii)     On the Effective Date, to Jeffrey Soffer, the sum of $1,000,000.00.  If a written settlement agreement is entered into, reached among, and acceptable to the Trustee, the Term Lender Group, and the defendants in each of the Brigade Action (defined below) and the Trustee Action (defined below), Jeffrey Soffer will contribute toward the settlement amount a cash payment in the amount of $2,000,000.00 in settlement of all claims that are or could be asserted by the Trustee in *Kapila v. Soffer, et al.*, Adv. Proc. 11-02102-AJC (Bankr. S.D. Fla.), unless the Trustee, the Term Lender Group, and the defendants in the Brigade Action and in the Trustee Action expressly agree otherwise to a different amount, provided that (i) nothing herein shall

---

[9] The description of the Comprehensive Settlement Agreement contained in this motion is a summary only.  In the event of any inconsistencies between the terms of the motion and the Comprehensive Settlement Agreement, the terms of the Comprehensive Settlement Agreement shall control.

be considered or deemed to be an agreement by or an obligation of the Trustee or the Term Lender Group to enter into a written settlement agreement under which Jeffrey Soffer does not agree to contribute a cash payment in excess of $2,000,000.00; and (ii) nothing herein shall be considered or deemed to be an agreement by or an obligation of Jeffrey Soffer to enter into a written settlement agreement under which Jeffrey Soffer is required to pay or contribute cash in an amount in excess of $2,000,000.00.

(iv)    On the Effective Date, to Lehman Brothers Holdings Inc., in its capacity as agent for the Retail Lenders ("Lehman"), the sum of $1,000,000.00 as payment and satisfaction of its allowed secured claim against the Retail Debtors' allocable share of the Fontainebleau Las Vegas Project and the Icahn Sale Proceeds pursuant to the terms of the Comprehensive Settlement Agreement.

20.    On the Effective Date, the Title Companies shall deliver to the Trustee, to be held and disbursed by the Trustee at the times and in the manner prescribed by the terms of the Comprehensive Settlement Agreement—(i) funds in the amount of $33,000,000.00, to be disbursed by the Trustee as Gross Statutory Lienholders Proceeds as provided in Section 2.02(a) of the Comprehensive Settlement Agreement, and (ii) funds in the amount of $350,000.00, to be held and applied by the Trustee as provided in Sections 2.03 and 7.02 of the Comprehensive Settlement Agreement. Following the Effective Date, the Trustee shall retain, as funds of the Bankruptcy Estates, the remaining $350,000 in Available Disbursement Funds, to be applied toward compensation awarded by the Bankruptcy Court to the Trustee on account of the disbursement of $33,000,000.00 in Gross Statutory Lienholder Proceeds referenced in Section 2.01(c)(i) of the Comprehensive Settlement Agreement, as provided in Section 7.02 of the Comprehensive Settlement Agreement.

21.    Title Companies/Lender Settlement Agreement. As part of the Comprehensive Settlement Agreement, the Title Companies, the Term Lenders and Wilmington have agreed to enter into the Title Companies/Lender Settlement Agreement, a copy of which is attached as *Exhibit E* to the Comprehensive Settlement Agreement.    Article VI of the Title

Companies/Lender Settlement Agreement sets forth the conditions precedent that must occur in advance of the obligation of the Title Companies to pay $33,350,000.00, which include, among other things, the execution of releases by the Term Lender Group and Wilmington, as well as a mutual release between the Title Companies and Bank of America, N.A. The Title Companies have, under the settlement, agreed to grant releases to the Term Lender Group and Wilmington, and to enter into mutual releases with the Turnberry Parties and dismiss three proceedings (two with prejudice, one without prejudice) brought by the Title Companies against various Turnberry Parties. The Title Companies will also, under the Title Companies/Lender Settlement Agreement, be entitled to a subrogation claim in the amount of $45 million with regard to any future recovery by Wilmington as an unsecured creditor of the Debtors.

22.    The Comprehensive Settlement Agreement provides for various releases and stipulations to be executed by the Term Lenders (solely in their capacity as holders of Term Loans), Wilmington, the Statutory Lienholders, the Turnberry Parties, and the Title Companies, in the forms attached as *Exhibits B-1 through B-7* to the Comprehensive Settlement Agreement. Certain claims and causes of action are excluded from the scope of the releases, including claims asserted in the Brigade Action and the Trustee Actions,[10] claims against the Resort Debtors and Retail Debtors, claims or rights of the Term Lenders arising under the Parent Guaranty and Resort Properties I Guaranty, and claims by third

---

[10] The Brigade Action and the Trustee Actions are separate proceedings brought by the Term Lenders and the Trustee, respectively, against former officers and directors of the Debtors and other parties, seeking damages for breach of fiduciary duty and other causes of action under state law. The releases and stipulations also exclude non-contract claims that could be asserted by or on behalf of holders of Term Loans or their predecessors, successors or assigns (all solely in their capacity as holders of Term Loans) arising out of or related to the facts asserted in the Brigade Action.

11

parties against any of the Turnberry Parties for contribution, indemnity, subrogation or similar claim. Claims not released and claims against third parties are expressly preserved.

23.   <u>BAR ORDERS</u>.  **THE APPROVAL ORDER SHALL INCLUDE BAR ORDERS AND ANTI-SUIT INJUNCTIONS WITH RESPECT TO THE FOLLOWING: i) WILMINGTON AND EACH OF THE BENEFICIARIES UNDER THE COMPLETION GUARANTY (INCLUDING WILMINGTON, THE LENDERS UNDER THE CREDIT AGREEMENT, THE INDENTURE TRUSTEE UNDER THE SECOND MORTGAGE NOTES INDENTURE, AND THE HOLDERS OF SECOND MORTGAGE NOTES), AND EACH OF THEIR SUCCESSORS AND ASSIGNS, ARE ENJOINED FROM PURSUING CLAIMS AGAINST ANY TURNBERRY PARTY ARISING UNDER OR BASED UPON THE COMPLETION GUARANTY OR THE COMPLETION GUARANTY JUDGMENT (THE "<u>COMPLETION GUARANTY BAR ORDER</u>"); (ii) THE STATUTORY LIENHOLDERS (AND ALL OTHER PARTIES THAT HAVE OR MAY HAVE MECHANIC'S LIEN CLAIMS IN THE FONTAINEBLEAU LAS VEGAS PROJECT), AND EACH OF THEIR SUCCESSORS AND ASSIGNS, WHETHER OR NOT THEY HAVE EXECUTED THE COMPREHENSIVE SETTLEMENT AGREEMENT OR EXHIBIT B-5, ARE ENJOINED FROM PURSUING CLAIMS AGAINST ANY TURNBERRY PARTY, THE TERM LENDERS, WILMINGTON, THE TITLE COMPANIES, THE EXAMINER, AND THE PROFESSIONALS BASED UPON, ARISING OUT OF, IN CONNECTION WITH OR RELATED TO FONTAINEBLEAU LAS VEGAS PROJECT (THE "<u>CONTRACTOR BAR ORDER</u>"); AND (iii) WILMINGTON AND THE LENDERS UNDER THE CREDIT AGREEMENT, AND EACH OF THEIR**

**SUCCESSORS AND ASSIGNS, ARE ENJOINED FROM PURSUING CLAIMS AGAINST THE TITLE COMPANY PARTIES THAT FALL WITHIN THE SCOPE OF THE RELEASE TO BE PROVIDED BY LENDERS IN THE FORM ATTACHED AS *EXHIBIT B-2* TO THE TITLE COMPANIES/LENDER SETTLEMENT AGREEMENT (THE "<u>TITLE COMPANIES BAR ORDER</u>").**

24.     <u>**EXCULPATION OF WILMINGTON**</u>.   Any and all claims of Lenders under the Credit Agreement and the Beneficiaries under the Completion Guaranty against Wilmington or its employees or professionals arising from or in connection with (i) entering into the Comprehensive Settlement Agreement and Title Companies/Lender Settlement Agreement and all agreements and documents relating thereto, and (ii) its acting as the performance of its duties as Administrative Agent under the Credit Agreement and as Disbursement Agent under the Master Disbursement Agreement or its performance of its duties thereunder on or prior to the Effective Date of the Comprehensive Settlement Agreement shall be deemed fully waived, barred, released and discharged in all respects, except as to those rights, obligations, duties, claims, and responsibilities expressly preserved, created or established under the terms of this Comprehensive Settlement Agreement and the Title Companies/Lender Settlement Agreement.  For the avoidance of doubt, nothing in this exculpation provision shall be construed as releasing or affecting in any way any claims against Bank of America, N.A., including claims against Bank of America, N.A. arising from or related to the performance of its duties as Administrative Agent under the Credit Agreement and as Disbursement Agent under the Master Disbursement Agreement.

25.     <u>Stay of Proceedings Pending Adjudication of the Joint Motion</u>.   Upon the execution of the Comprehensive Settlement Agreement, the Settlement Parties shall exercise

reasonable efforts to jointly request a stay from the courts with respect to the proceedings listed in *Exhibit A* attached to the Comprehensive Settlement Agreement, pending this Court's determination of the Joint Motion.   On or before five (5) days after the Effective Date, the Settlement Parties shall take all necessary actions to obtain the dismissal with prejudice of the proceedings identified in *Exhibit A* attached to the Comprehensive Settlement Agreement, except for the Retail Indemnity Action, which shall be dismissed without prejudice, and the Eleventh Circuit appeal, which shall be dismissed as moot.

26.    <u>Provisions Related to Term Lenders that Hold Second Mortgage Notes</u>.  The Comprehensive Settlement Agreement contains certain representations and warranties from the Term Lenders, and their managers and advisors, regarding the Second Mortgage Notes.

27.    <u>Settlement Between Retail Debtors and Resort Debtors</u>.  The Trustee shall seek and obtain Bankruptcy Court approval of a settlement under which $1,000,000.00 of the Icahn Sale Proceeds shall be allocated to the Retail Debtors and thereafter distributed to the Retail Agent, and the remaining balance of the Icahn Sale Proceeds shall be allocated to the Resort Debtors to be distributed in a manner consistent with the Comprehensive Settlement Agreement.

28.    <u>Conditions to Effective Date</u>.  The Comprehensive Settlement Agreement is binding but shall not be enforceable until the date that each of the following conditions has been satisfied:

> (a)    All of the conditions precedent set forth in Article VI of the Title Companies/Lender Settlement Agreement (except for the Effective Date of the Comprehensive Settlement Agreement and the payment by the Title Companies to the Trustee of $33,350,000.00, which shall occur on the Effective Date of the Comprehensive Settlement Agreement) shall have been satisfied in all respects.  No later than three (3) business days after this condition has been satisfied, Wilmington, the Term Lenders and the Title

Companies shall provide to the Bankruptcy Court and the Settlement Parties notice of occurrence and satisfaction of this condition.

(b)　　The Turnberry Parties shall have given and received all of the applicable dismissals, satisfactions and releases called for by the Comprehensive Settlement Agreement or *Exhibit A*, attached to the Comprehensive Settlement Agreement to be provided by the Turnberry Parties and the Title Companies.

(c)　　The Bankruptcy Court shall have entered an order (the "Approval Order"), in the form attached as *Exhibit C* to the Comprehensive Settlement Agreement (or in such form as approved in writing by counsel for all the Settlement Parties), approving the Comprehensive Settlement Agreement, issuing the Completion Guaranty Bar Order, the Contractor Bar Order and the Title Companies Bar Order, providing for the exculpation of Wilmington as described in Section 3.02(f), and determining that the allocation of proceeds under the Comprehensive Settlement Agreement is reasonable in all respects, and is binding and enforceable as to any creditor or party in interest that has or may assert a lien against the Fontainebleau Las Vegas Project and the Icahn Sale Proceeds Balance. Such order shall have become a final order that is not subject to appeal (or, if a timely appeal is filed and the Approval Order is affirmed, the date that any order affirming the Approval Order is no longer subject to appeal), or such earlier date as agreed to in writing by all of the Settlement Parties to the Comprehensive Settlement Agreement.

(d)　　The Settlement Parties (except, as to the Statutory Lienholders, only those Parties represented by Statutory Lienholders Counsel) shall have executed and delivered the releases and stipulations attached to the Comprehensive Settlement Agreement as *Exhibit B-1*, *Exhibit B-2*, *Exhibit B-3*, *Exhibit B-4*, *Exhibit B-5*, *Exhibit B-6* and *Exhibit B-7*, inclusive.

29.　　Occurrence of Effective Date.　The Comprehensive Settlement Agreement shall become effective, and the Effective Date shall occur, only upon the delivery of all of the funds as provided under Section 2.01 of the Comprehensive Settlement Agreement and the making of all of the indefeasible disbursements as provided under Section 2.02 of the Comprehensive Settlement Agreement. Any funds delivered under Section 2.01 of the Comprehensive Settlement Agreement or disbursements made under Section 2.02 of the Comprehensive Settlement Agreement shall, upon receipt, be held in escrow by the recipients until the occurrence of the Effective Date as provided in this Section 5.02 of the

Comprehensive Settlement Agreement, at which time any such escrow shall automatically terminate and the funds and disbursements shall be deemed released from escrow.

30. <u>Right to Terminate</u>. In the event that the Effective Date does not occur on or prior to the date that is ninety (90) days after the date of the Comprehensive Settlement Agreement, any Party shall, prior to the Effective Date, have the right but not the obligation to terminate the Comprehensive Settlement Agreement by written notice to the other parties, in which case the Comprehensive Settlement Agreement and the Exhibits attached thereto shall become void and be of no force and effect, in which event no Party shall be deemed to have waived his, her, or its rights or be estopped from pursuing any rights or remedies available in law or equity.

31. <u>Fees and Costs</u>. Each Party is to bear its own fees and expenses, except as provided in the Comprehensive Settlement Agreement with respect to the Statutory Lienholders, provided, that fees and expenses of Wilmington are to be paid from the proceeds distributed to Wilmington, in accordance with the Credit Agreement and Master Disbursement Agreement, as applicable.

32. <u>Additional Terms Related to Statutory Lienholders</u>.

    (a)    Within seven (7) days following entry of the Approval Order, co-lead counsel for the Statutory Lienholders, Gordon Silver as counsel for the M&M Lienholders and Ehrenstein Charbonneau Calderin as counsel for JMB Capital Partners Master Fund, L.P. (together, the "<u>Statutory Lienholders Counsel</u>"), shall submit invoices for payment of fees and reimbursement of expenses (including fees of local counsel) incurred in connection with the Bankruptcy Cases for the common interest of the Statutory Lienholders. Any fees and costs of Statutory Lienholders Counsel approved by the Bankruptcy Court shall be paid solely from the Gross Statutory Lienholders Proceeds.

    (b)    Within seven (7) days following entry of the Approval Order, counsel for other Statutory Lienholders, other than the Statutory Lienholders Counsel, may submit invoices for fees and reimbursement of expenses incurred by such Statutory Lienholders regarding the common interests of the Statutory

16

Lienholders in the Bankruptcy Cases, accompanied by a statement as to the reason that such fees and costs were incurred for the common interest of the Statutory Lienholders; provided, however, that the Statutory Lienholders reserve any and all rights to object to the payment of fees and costs of counsel other than Statutory Lienholders Counsel.

(c)     Neither Statutory Lienholders Counsel nor other counsel for any of the Statutory Lienholders shall have or assert an administrative expense in the Bankruptcy Case for attorneys' fees and costs incurred in connection with the Bankruptcy Case or enforcement of a mechanic's lien, and any payments to any such counsel shall be disbursed solely from the Gross Statutory Lienholders Proceeds.

(d)     On the fifteenth (15) day following entry of an order approving the fees set forth in subsections (a) and (b), above, or as soon as reasonably practical thereafter, the Trustee shall pay the amounts awarded from the Gross Statutory Lienholders Proceeds.

(e)     The remaining available proceeds, following the disbursements required by Section 6.01, subsections (a), (b) and (c) of the Comprehensive Settlement Agreement, are defined as the "Net Statutory Lienholder Proceeds." The Statutory Lienholders' liens shall be deemed to have attached to the Net Statutory Lienholder Proceeds.

(f)     Within forty-five (45) days of the Effective Date, each Statutory Lienholder shall produce to a document depository (i) an amended proof of claim, setting forth with specificity the amount of such claim incurred in connection with the Project (the "Lien Claim"); (ii) all documents relating to the Lien Claim in a manner which complies with Fed.R.Civ.P. 34; (iii) an index which identifies the documents produced; and (iv) a list of persons (other than experts or consultants) then known or reasonably believed to have knowledge of any facts relevant to the allegations of any Lien Claim, including, if known, each such person's address and telephone number.  The document depository and its custodian shall be agreed upon by Statutory Lienholders Counsel no later than ten (10) days following entry of the Approval Order.

(g)     On or before the Effective Date, the Bankruptcy Court shall enter an order requiring the Statutory Lienholders to participate in a mandatory mediation regarding the perfection, validity, and amount of the Statutory Lienholders' Lien Claims (the "Mediation"), pursuant to the following procedures:

(i)     The Mediation may commence no later than 150 days following the Effective Date.

(ii)    The Mediation shall be conducted by a mediator agreed upon by Statutory Lienholders Counsel and the Trustee and subject to Bankruptcy Court approval as a professional of the Trustee, or if

17

the Statutory Lienholders Counsel and Trustee cannot agree on the mediator, as selected by the Bankruptcy Court following the submission of recommendations by the Statutory Lienholders and the Trustee (the "Mediator"). The Mediator shall receive reasonable compensation from the Net Statutory Lienholders Proceeds.

(iii)    The Trustee shall have standing to participate in the Mediation, and the reasonable professional fees and expenses that he may incur for providing information or assistance to the Mediator (but not professional fees and expenses incurred on behalf of the Bankruptcy Estates as an interested party) will be compensated from the Net Statutory Lienholder Proceeds, following notice to the Statutory Lienholders and a hearing.

(iv)    The Statutory Lienholders shall provide the Mediator with pre-Mediation Statements at least twenty (20) days before the Mediation (the "Statements"). The Statements shall make reference to the documents that support each Statutory Lienholder's claim of lien, but need not attach such documents. The Mediator shall have access to the document depository for the purpose of preparing for Mediation and access shall be granted to the Mediator from the date of his or her appointment. The Mediation shall proceed over as many days as is necessary for the Mediation to succeed or result in an impasse. The Mediator shall have the authority to make a recommendation and report regarding the perfection, validity, and amount of the Statutory Lienholders' Lien Claims; provided, however, that any such recommendation or report issued or used by the Mediator shall constitute a confidential settlement discussion that shall not be disclosed in the Lien Action and shall not constitute evidence or have any evidentiary value in any proceeding.

(v)    Participation in the Mediation by a representative of each Statutory Lienholder with full authority to settle and bind such Statutory Lienholder shall be mandatory. No Statutory Lienholder may terminate its participation in the Mediation without the approval of the Mediator. The Mediator shall report to the Bankruptcy Court any Statutory Lienholder that (i) fails to participate through a representative with full authority to settle; (ii) terminates its participation in the Mediation without the Mediator's approval; (iii) and/or does not participate in good faith, and such Statutory Lienholder may be subject to any sanction available under the Federal Rules of Civil Procedure or the Bankruptcy Code, up to and including, dismissal and disallowance of such Statutory Lienholder's Lien Claim.

(vi)    The Mediation shall continue until the earlier of (i) settlement; (ii)

18

the Mediator declares an impasse; or (iii) the Bankruptcy Court enters an order terminating the Mediation upon motion by any Statutory Lienholder(s) seeking to terminate the Mediation and after notice and hearing (the "Remand Motion").  Only if the Statutory Lienholders have not reached a settlement within three (3) full-day sessions of Mediation may an impasse be declared. No participant may file a Remand Motion before the three (3) full day sessions of Mediation have taken place.  All participants to the Mediation shall have standing to oppose the Remand Motion and all such participants, including the Trustee, may file objections to the Remand Motion with the Bankruptcy Court.  In considering the Remand Motion, the Court will consider the status of the Mediation, the positions of the Mediator, the Trustee, and any Statutory Lienholders that participated in the Mediation. If the Court denies the Remand Motion, the Court shall order the Statutory Lienholders to continue the Mediation until such time as the Mediator declares an impasse or another Statutory Lienholder files a Remand Motion.

(vii)    Upon entry of an order by the Bankruptcy Court terminating the mediation, the Statutory Lienholders shall initiate an action or re-commence an existing action (the "Lien Action") pursuant to Chapter 108 of the Nevada Revised Statutes ("NRS") before the District Court for the Eighth Judicial District of Nevada, in and for Clark County (the "Nevada Court"), and the automatic stay imposed by 11 U.S.C. § 362(a) shall be terminated to the full extent necessary to allow for such Lien Action to commence and proceed.

(h)    Upon the commencement of a Lien Action, the following procedures shall apply:

(i)    Such Lien Action shall be solely an action to enforce mechanic's liens under NRS Chapter 108.  As part of the approval of the Comprehensive Settlement Agreement, the Parties stipulate to modification of the automatic stay to permit the Nevada Court to adjudicate the Fixed Lien Claims (defined below).

(ii)    Pending adjudication, the Trustee shall hold the Net Statutory Lienholder Proceeds for the benefit of the Statutory Lienholders. For purposes of adjudicating lien rights, the Net Statutory Lienholder Proceeds shall be treated analogously to and as if they constituted a joint mechanic's lien release bond under NRS 108.2415(1) for the sole benefit of Statutory Lienholders holding valid and properly perfected mechanic's liens; provided, however, that the Trustee neither—(1) shall be deemed as a "principal" or a

"surety" under, nor (2) otherwise be required to comply with the requirements of—NRS 108.2413 to NRS 108.2425, inclusive.

(iii)    Upon the entry of an Order granting the Remand Motion the Bankruptcy Court shall only retain jurisdiction over any deficiency claims of the Statutory Lienholders and any claims by the Statutory Lienholders against the Debtors or the Bankruptcy Estates.

(iv)    The Trustee shall be named in the Lien Action as an "owner" as that term is defined in the Nevada mechanic's lien statute, and the Trustee hereby submits to the exclusive jurisdiction of the Nevada Court over the Net Statutory Lienholder Proceeds and determination of the Fixed Lien Claims.  The Trustee shall not make any motion under NRS 108.2275 to expunge any lien.

(v)    Notwithstanding the releases being provided to the Turnberry Parties pursuant to Section 3.03(c) of the Comprehensive Settlement Agreement, nothing shall prohibit the Statutory Lienholders from naming TWC only (and no other Turnberry Party) as a nominal party in the Lien Action to the extent legally required, provided that TWC shall not be subject to any liability in the Lien Action, and no current or former officer, director, employee, principal, shareholder, or owner of TWC may be named as a party or be subject to any personal or other liability as a result thereof.

(vi)    The Statutory Lienholders' release of any Party to the Comprehensive Settlement Agreement is not intended to and shall not impair or otherwise affect the validity or allowability of any claims or liens asserted by the Statutory Lienholders, or any of them, against the Debtors or any Statutory Lienholder's right or ability to recover its pro rata share from the Net Statutory Lienholder Proceeds, and therefore any liability of a Party released by the Statutory Lienholders, or any of them, shall continue to exist solely for the express and limited purpose and only to the extent necessary to avoid the application of the "Severin doctrine" (*Severin v. United States*, 99 Ct. Cl. 435 (1943)), or any other similar doctrine that would otherwise impair the rights of the Statutory Lienholders or that would otherwise affect the validity or allowability of any claims or liens asserted by the Statutory Lienholders, or any of them, against the Debtors or any Statutory Lienholder's right or ability to recover its pro rata share from the Net Statutory Lienholder Proceeds, based upon the premise that a Statutory Lienholder released the liability of a party to which such Statutory Lienholder was liable or with whom or which it contracted.  Nothing in th paragraph 6.04(f) of the Comprehensive Settlement Agreement shall be construed as an acknowledgement or admission that any of the released parties have any liability to

20

the Statutory Lienholders.    The sole intent and purpose of paragraph 6.04(f) is to allow the Statutory Lienholders to pursue their full claims against the Net Statutory Lienholder Proceeds and their full allowed claims against the Debtors notwithstanding any releases set forth in the Comprehensive Settlement Agreement (but only during such period in which the Statutory Lienholders attempt to recover on the Statutory Liens and claims in accordance with Article VI of the Comprehensive Settlement Agreement). Paragraph 6.04(f) of the Comprehensive Settlement Agreement is not intended (i) to otherwise limit the releases provided under Section 3.03 of the Comprehensive Settlement Agreement or the Contractor Bar Order, (ii) to continue or to relitigate the litigation of existing claims or actions that are being released pursuant to Section 3.03 of the Comprehensive Settlement Agreement or the Contractor Bar Order, (iii) otherwise to create any new or different claims or liabilities against Parties released by Statutory Lienholders under the Comprehensive Settlement Agreement and Exhibits B-5 and B-6, or (iv) to expose such Parties to any deficiencies or other losses that may exist during or after the Statutory Lienholders' attempt to recover their claims against the Debtors and the Net Statutory Lienholder Proceeds.    Except as provided in Section 6.04(e) of the Comprehensive Settlement Agreement, pending the Statutory Lienholders' pursuit of and attempt to recover under Article VI of the Comprehensive Settlement Agreement their pro rata share of the Net Statutory Lienholder Proceeds and their distributions on account of their allowed claims against the Debtors, the Statutory Lienholders shall neither commence nor pursue suits or actions against the Parties released by the Statutory Lienholders under the Comprehensive Settlement Agreement.

(vii)    Each Statutory Lienholder claiming a right to distribution from the Net Statutory Lienholder Proceeds shall, after notice, file and serve a Statement of Facts Constituting Lien, setting forth with specificity the amount of such claim incurred in connection with the Project, or join into the designated case as required by NRS 108.239(3).  No duplicate claims of the Statutory Lienholders shall be allowed.

(viii)    Each Statutory Lienholder shall be required to file a "demand for a preferential trial setting" under NRS 108.2421 or NRS 108.239(8) no sooner than the conclusion of the discovery period that may be set by agreement of the Statutory Lienholders or as directed by the Discovery Master unless otherwise ordered by the Nevada Court, and the Lien Action shall be concluded within one (1) year of the date the Lien Action, if any, is commenced, unless otherwise ordered by the Nevada Court.

(ix)    The determination of the lienable amounts may be assigned to a special master as permitted in NRS 108.239(7) and NRCP 53, but the Nevada Court shall determine whether each mechanic's lien claim is properly perfected and valid (the properly perfected and valid lienable amounts, the "Fixed Lien Claims").

(h)    The Trustee shall distribute the Net Statutory Lienholder Proceeds, on a pro rata basis, to the Statutory Lienholders holding the Fixed Lien Claims as ordered by the Nevada Court. Each properly perfected and valid mechanic's lien claim shall be deemed equal in priority to every other properly perfected and valid mechanic's lien claim under NRS 108.236.

(i)    Any costs of the Lien Action exclusive of the Trustee's attorneys' fees, payment of which is governed by Section 6.01 of the Comprehensive Settlement Agreement shall be paid solely from the Net Statutory Lienholder Proceeds, before distribution to any Statutory Lienholder on account of a Fixed Lien Claim.

(j)    The Trustee has determined that avoidance actions under Chapter 5 of the Bankruptcy Code against the Statutory Lienholders listed on _Exhibit F_ , attached to the Comprehensive Settlement Agreement, either (i) do not exist or (ii) have been settled or otherwise resolved. The Trustee specifically retains any and all rights, claims, and actions under the applicable settlement agreements pursuant to which actions against Statutory Lienholders listed on _Exhibit F_ attached to the Comprehensive Settlement Agreement, have been resolved. The Trustee retains causes of action under Chapter 5 of the Bankruptcy Code against those Statutory Lienholders not listed on _Exhibit F_ attached to the Comprehensive Settlement Agreement, and such causes of action shall not be affected by the Comprehensive Settlement Agreement.

(i)    No Turnberry Party or other entity affiliated with Turnberry, TWC, or the Soffers shall receive a distribution of the Statutory Lienholders Payment under the Comprehensive Settlement Agreement, or participate in the Mediation or the Lien Action, or have an allowed claim in the Bankruptcy Cases, except that each of Republic Tower & Hoist, LLC, American Crane and Hoist Erectors, LLC, and Republic Crane Services, LLC shall each be entitled to determine and receive its Fixed Lien Claim as part of the Mediation and Lien Action, and have a claim in the Bankruptcy Cases but only as is allowed by the Bankruptcy Court. Notwithstanding the releases provided in Section 3.03, the Statutory Lienholders reserve the right to assert objections to the Lien Claims being asserted by Republic Tower & Hoist, LLC, American Crane and Hoist Erectors, LLC, and Republic Crane Services, LLC in the Mediation and the Lien Action.

(j)    To the extent of the deficiency claim remaining with respect to any Fixed Lien Claim, the following provisions shall apply:

(i)    Each Statutory Lienholder that timely filed a proof of claim shall, not later than thirty (30) days following the disbursement of the

Net Statutory Lienholders Proceeds, amend such proof of claim to assert an unsecured claim equal to its Fixed Lien Claim less its pro rata share of the Gross Statutory Lienholders Proceeds, which shall be deemed allowed, together with any claim not based on Nevada's mechanic's lien statute.  Subject to any objections not waived by Section 6.08(b) of the Comprehensive Settlement Agreement to the allowance of such claims, the Statutory Lienholders shall share pro rata with other unsecured creditors in any distribution to the extent such claims are allowed.

(ii)    Neither Wilmington, the Term Lenders, nor any other Party shall assert claim objections to the unsecured deficiency claims of the Statutory Lienholders on the basis of equitable subordination or lack of privity as contained, respectively, in Counts 1 and 2 of the Amended Complaint filed on January 10, 2013 [ECF No. 552], in *Wilmington Trust FSB, as administrative agent v. A1 Concrete Cutting and Demolition LLC, et al.*, Adversary Proc. 09-02480-AJC (Bankr. S.D. Fla.), except that the Trustee reserves the right to assert objections to the claims of Republic Tower & Hoist, LLC, American Crane and Hoist Erectors, LLC, and Republic Crane Services, LLC).

(k)    Nothing in the Comprehensive Settlement Agreement shall be deemed to extend or reopen the bar date previously established in the Bankruptcy Cases for filing proofs of claim, and no provision of the Comprehensive Settlement Agreement shall be construed as extending or reopening the deadline for perfecting mechanics' lien claims.

33.    <u>Statutory Compensation</u>. The Comprehensive Settlement Agreement shall be without prejudice to the Trustee's right to seek reasonable compensation (as determined by the Bankruptcy Court pursuant to Sections 326 and 330 of the Bankruptcy Code) from the Bankruptcy Estates for his services as trustee and the right of creditors and parties in interest to object to any such request.  For purposes of calculating reasonable and maximum compensation on account of the $33,000,000.00 in Gross Statutory Lienholder Proceeds received from the Title Companies pursuant to Section 2.01(c)(i) of the Comprehensive Settlement Agreement and disbursed under Section 2.02(a) of the Comprehensive Settlement Agreement, (a) the Trustee agrees that he will not seek compensation exceeding two percent (2%) of such $33,000,000.00 amount, and (b) the $350,000.00 sum delivered by the Title Companies pursuant to Section

2.01(c)(ii) of the Comprehensive Settlement Agreement shall be applied to the compensation awarded by the Bankruptcy Court on account of such $33,000,000.00 amount disbursed.

## Argument

## I.    THE COMPREHENSIVE SETTLEMENT AGREEMENT IS FAIR AND EQUITABLE AND SHOULD BE APPROVED

34.    Under well-settled bankruptcy law, compromises must be shown to be "fair and equitable." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  The test applied to evaluate whether a proposed settlement is fair and equitable is "whether the compromise falls below the 'lowest point in the range of reasonableness.'" *In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988).  In approving or disapproving a settlement, the Bankruptcy Court must consider: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.  *In re Justice Oaks II, Ltd*, 898 F.2d 1544, 1549 (11th Cir. 1990).

35.    Each of those four factors weighs heavily in favor of approval of the Comprehensive Settlement Agreement.

### A.    Probability of Success in Litigation

36.    As described above, there are numerous interrelated litigation proceedings and disputes that need to be considered in weighing this factor.  Given the inherent risks of litigation as further described below and the certainty to be provided under the

Comprehensive Settlement Agreement, from the perspective of each of the Settlement Parties, the settlement falls within a reasonable range of recovery.

37.    <u>Statutory Lienholders</u>.    The Comprehensive Settlement Agreement provides for a distribution of about $85.3 million to be allocated to and divided among the Statutory Lienholders pursuant to the process described in the Comprehensive Settlement Agreement. In addition, under the Comprehensive Settlement Agreement, the Settlement Parties have agreed not to assert lack of privity or equitable subordination as grounds to object to the Statutory Lienholders' unsecured deficiency claims.    Finally, the Trustee has included a list of those Statutory Lienholders against whom avoidance actions either do not exist or have been settled or otherwise resolved, providing certainty to the Statutory Lienholders concerned about the existence of potential avoidance actions against them.

38.    If the Statutory Lienholders were to prevail entirely in the Priority Litigation and the Eleventh Circuit Appeal, they could theoretically recover as much as $120 million in the aggregate (consisting of $93 million of remaining Icahn Sale Proceeds, a potential disgorgement claim against Wilmington and the Term Lenders equal to about $16 million, a potential disgorgement claim against the Professionals of about $8 million, and a potential disgorgement claim against the Trustee equal to about $3 million).[11]

39.    That said, a review of the transcript of the oral argument that took place in the Eleventh Circuit Appeal, along with the appeal briefs that were filed in that proceeding, demonstrates that the Statutory Lienholders face a meaningful risk that the Eleventh Circuit could reverse the District Court Order.    Such a ruling would reduce the maximum aggregate

---

[11] Wilmington, the Term Lenders and the Title Companies dispute that the Statutory Lienholders are entitled to any such recovery.

recovery of the Statutory Lienholders on account of their secured claims to $93 million, assuming that they were to prevail in the Priority Litigation.

40.    Although the Nevada Supreme Court's ruling resulted in Wilmington withdrawing prior causes of action for equitable subrogation and contractual subordination, Wilmington's amended complaint in the Priority Litigation asserts causes of action for equitable subordination, failure to comply with section 546(b)(2) of the Bankruptcy Code, and disallowance of any unsecured claims, along with objections to the validity and amount of the liens asserted. The briefs filed in the Priority Litigation in support of and in opposition to the motions to dismiss Wilmington's amended complaint raise numerous issues of law and fact that, in the absence of a settlement, would need to be adjudicated by this Court. If Wilmington were to prevail on one or more of those causes of action, the aggregate distribution to Statutory Lienholders could fall below the approximately $85.3 million to be allocated to the Statutory Lienholders under the Comprehensive Settlement Agreement. Moreover, it is possible that certain specific Statutory Lienholders who might be more vulnerable to Wilmington's causes of action could end up with a recovery of zero. The Comprehensive Settlement Agreement eliminates that risk faced by the Statutory Lienholders, both collectively and individually.

41.    In addition to resolving the disputes between the Statutory Lienholders on the one hand, and Wilmington Trust, the Term Lenders, the Title Companies, and the Trustee (and the Examiner and Professionals) on the other hand, the Comprehensive Settlement Agreement also creates a process to liquidate the amount of the claims of Statutory Lienholders. That process, subject to involvement of the Trustee as described below, will avoid potential intramural disputes among the Statutory Lienholders that might otherwise

arise, such as the need to determine the priority under Nevada law of the different liens asserted by the Statutory Lienholders.

42.    Accordingly, for the Statutory Lienholders, the settlement falls within the range of reasonableness.

43.    <u>Wilmington/Term Lenders</u>.  Under the Comprehensive Settlement Agreement, Wilmington will, on behalf of the lenders under the Credit Agreement (including the Term Lenders), receive a distribution of about $89 million, payable from the Icahn Sale Proceeds. That amount falls with the range of reasonable outcomes that could result in the Priority Litigation and the Eleventh Circuit Appeal, especially taking into account the nearly $50 million in value that Wilmington is contributing through the judgment that it obtained against Turnberry Residential in the Completion Guaranty Litigation.  The Comprehensive Settlement Agreement eliminates the risk of Wilmington receiving none of the Icahn Sale Proceeds and the possibility of further litigation with Turnberry Residential regarding the distribution of the Completion Guaranty Proceeds, along with the cost, delay and risk of litigation with the Title Companies regarding their coverage obligations under the title policy.

44.    <u>Turnberry Parties</u>.  Turnberry Residential contends that, notwithstanding the conclusion of the appeal process in New York state court, it has the right to challenge any use of the Completion Guaranty Proceeds that does not constitute payment of an "Applicable Project Cost," as that term is defined in the Completion Guaranty.  Wilmington and the Term Lenders dispute that Turnberry Residential has any power to inhibit the use of the Completion Guaranty Proceeds to pay Applicable Project Costs.

45.    Separately, Wilmington has commenced proceedings to enforce the Completion Guaranty Judgment and recover the additional $50 million portion of the judgment that is not secured by the existing Completion Guaranty Proceeds. Jacqueline Soffer asserts a competing judgment lien against the assets of Turnberry Residential. Although Wilmington believes that its judgment lien should have priority over any judgment lien asserted by Jacqueline Soffer, there is no certainty that Wilmington would prevail.

46.    The Comprehensive Settlement Agreement resolves the above disputes by providing that about $49 million of the Completion Guaranty Proceeds will be used to pay the secured claims of the Statutory Lienholders (which constitute Applicable Project Costs), and the balance of $1 million will be paid to Jeffrey Soffer, subject to his agreement to contribute $2 million in cash in settlement of all claims that are or could be asserted by the Trustee in *Kapila v. Soffer, et al.*, Adv. Proc. 11-02102-AJC (Bankr. S.D. Fla. June 8, 2011), unless the parties to such settlement expressly agree otherwise to a different amount, as further provided in the Comprehensive Settlement Agreement. The Turnberry Parties will obtain the benefit of releases and bar orders in exchange for their consent to the use of the Completion Guaranty Proceeds under the Settlement Agreement. Notably, those releases and bar orders are limited in certain respects; for example, the releases do not apply to the non-contract claims that have been brought or could be brought in the Brigade Action and the Trustee Actions.

47.    Title Companies. In broad terms, the Title Companies will pay $33.35 million and, with respect to the Turnberry Parties, enter into mutual releases and dismiss various proceedings, in exchange for which the Title Companies will obtain broad releases, bar orders and a termination of the title policy that have the effect of relieving the Title

Companies from any further obligations under the title policy, along with a subrogation claim equal to $45 million that will share in any recovery by Wilmington as an unsecured creditor of the Debtors. But for the Comprehensive Settlement Agreement and related Title Companies/Lender Settlement Agreement, the Title Companies would remain subject to claims previously asserted under the title policy by Wilmington and the Term Lenders. The Title Companies have previously assumed defense obligations but with a reservation of rights, and under the Title Companies/Lender Settlement Agreement, the Title Companies have denied liability under the title policy on account of those claims. It thus appears likely that, if the Statutory Lienholders were to prevail in the Priority Litigation and/or the Eleventh Circuit Appeal, the parties to the Title Companies/Lender Settlement Agreement would need to litigate the coverage obligations of the Title Companies under the title policy. The settlement enables the Title Companies, as well as Wilmington and the Term Lenders, to avoid the additional cost and delay that would otherwise result.

48.    <u>Trustee for Retail Debtors</u>. Under the Comprehensive Settlement Agreement, $1 million of the Icahn Sale Proceeds will be allocated to the Retail Debtors, all of which will be distributed to the Retail Lenders.

49.    Absent the settlement, it is likely that the allocation to the Retail Debtors would be zero. Pursuant to section 506(c) of the Bankruptcy Code, the value of the assets sold to Icahn Nevada is determined "in light of the purpose of the valuation and of the proposed disposition or use of the property." 11 U.S.C. § 506(a); *see also Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997).

50.    Based on the record before this Court, the Retail Debtors face the likelihood that little to no value will be attributable to their assets for purposes of distribution of the

Icahn Sale Proceeds. It is reasonable to infer that Icahn Nevada did not intend to complete construction of the Project and that it acquired the Debtors' assets for the purpose of liquidating them and holding the land. On December 2, 2009, about one week after Icahn Nevada became the stalking horse bidder, the financial advisor for the Debtors (including the Retail Debtors) testified at a hearing about discussions with Icahn Nevada, during which Icahn Nevada was contemplating that it would not develop the project and instead would "take this property down to the land:"

> Q.    But, nevertheless, Icahn has offered $155 million because of the potential – the development potential of the property, correct?
>
> A.    I do not know that to be the case, that Icahn sees value in the asset to develop it as opposed – ***they may see value just in the land***.
>
> Q.    So it's your understanding that they want to develop it for something other than a casino?
>
> A.    No, I did not say that. I said I do not know what their intention is. ***I've had conversations with them going from what does it cost to take this property down to the land and we will just land bank***, to just sit on it for two years, to develop it.

12/2/09 Tr., at 4:7-19 (emphasis added)(ECF No. 1349).

* * *

> Q.    But in this particular case, there is the – it's being purchased for development potential. They are not paying $155 million to do nothing with it.
>
> A.    I cannot testify to that. ***I have had conversations with them that clearly indicate to me that that is an option that they might be considering***.
>
> Q.    But let me ask you this: The $155 million, the value that's seen in that is its future development potential; isn't that correct? Or are they paying $155 million for the ground?
>
> A.    You would have to ask Mr. Icahn that, but –

Q.     So you don't know the answer to that question without me asking Mr. Icahn?

A.     I can tell you from my conversations with him *he has certainly gone through the debate and the conversation of it is, are we just buying this for land value and does it make more sense to look at it from that*

12/2/09 Tr., at 42:7-43:2 (emphasis added)(ECF No. 1349).

51.     Events subsequent to the closing of the sale further indicate that Icahn Nevada did not intend to develop the Project when it purchased the Debtors' assets. For example, shortly after the sale, Icahn Nevada engaged an auction company to liquidate all of the personal property that would have been required to complete development of the Project. *See, e.g.*, Deposition of Michael Frate dated March 14, 2012, at 21:12-22:6. Perhaps most telling, three and a half years have passed since the sale, and the Project remains undeveloped and deteriorating, leaving little doubt as to Icahn Nevada's intended disposition of the Project at the time of the sale.

52.     Courts that have been called upon to allocate value among assets sold together as a package consider the independent value of the assets as if sold independently and not as a package. For example, in *In re Hawaiian Telcom Comms., Inc.*, 430 B.R. 564, 581-84 (Bankr. D. Haw. 2009), the court found that the value of unencumbered easements sold as part of an enterprise (whose assets were otherwise largely encumbered) was zero because the easements had no separate market value if decoupled from the enterprise.[12] Likewise, in *In*

---

[12] The ability of the Retail Debtors (or a purchaser of their assets) to realize any going concern value on account of their interest in the real property hinged entirely upon completion of the Project by the Resort Debtors. Under Section 2.2(d) of the Intercreditor Agreement between Wilmington (as successor) and the Retail Lender, if Wilmington or the Resort Lenders took possession of the Project through foreclosure or otherwise, or sold the Project to a third party, neither Wilmington and the Resort Lenders, nor the third party purchaser, was obligated to complete construction of the Project. As of February 2010 when the sale to Icahn Nevada closed, the Resort Debtors were in default under the Credit Agreement, and subject

*re 26 Trumbull Street*, 77 B.R. 374 (Bankr. D. Conn. 1987), the court allocated the excess value generated from the sale of encumbered and unencumbered assets by determining the separate value of those assets and then dividing the excess proceeds in proportion to the value of the assets if not sold together.

53.     Applying the above methodology, the value of the assets owned by the Retail Debtors arguably was <u>zero</u> at the time of the sale.  At a hearing held on December 2, 2009, this Court found, "based on the testimony of the witnesses and the analysis of this case from its beginning … at the time of the filing of the petition and at the present time that the Retail leasehold interest has zero value as a stand-alone item."  12/2/09 Tr. [Docket No. 1349], at 85:15-20.  That finding was based on, among other evidence, testimony from the chief restructuring officer that the value of the Retail Debtors' assets, on an as-is basis, was "zero value." *Id.* at 24:16-22.[13]

54.     In contrast to the Retail assets, the real and personal property owned by the Resort Debtors and sold to Icahn Nevada had, as of February 2010, independent value to Icahn Nevada that did not depend upon completion of construction of the Project.  This Court previously approved a settlement under which it allocated $6.84 million of the Icahn Sale Proceeds to the personal property assets alone.  *Order Granting Motion to Approve Settlement Agreement of the Wilmington Trust Personal Property Allocation Motion and QTS Counterclaim*, August 2, 2012 [ECF No. 3740], at ¶¶ 2-4.  As for the real property owned by the Resort Debtors, Icahn Nevada can realize value by razing the existing

only to the automatic stay could have, in the absence of a sale to Icahn Nevada, taken possession of the Project.  Had that occurred, any realization of value by the Retail Lenders would have hinged entirely on the discretion of the Resort Lenders or a subsequent third party purchaser.

[13] The Schedule of Assets and Liabilities filed by the Retail Debtors in December 2009, shortly before the Closing of the sale, attributed a value of <u>zero</u> to the real property owned by the Retail Debtors and any mortgage on that real property.  (ECF No. 1376, Schedule A).

incomplete structure and selling the land as vacant, or by selling the land to a buyer that would do so. In financial statements prepared by Icahn Nevada's parent in March 2010, Icahn Nevada attributed a value of $91 million to the land alone.

55.     Thus, based on the relative value of the assets of the Resort Debtors and Retail Debtors as used by Icahn Nevada, all of the Icahn Sale Proceeds should arguably be allocated to the assets conveyed by the Resort Debtors.

56.     The Retail Debtors would face the same significant risks if the Project were valued on a going concern basis. In *In re LTV Steel Company, Inc.*, 285 B.R. 259 (Bankr. N.D. Ohio 2002), the bankruptcy court determined the allocation of the going concern value of a collection of assets sold by the Debtors. In making its determination, the court recognized that it had to take into account not only the "positive value" of the going concern, but also its "negative value" comprising capital expenditures or liabilities that would need to be incurred in order to operate the assets as a going concern. In *LTV*, the "negative value" consisted of, among other things, future capital expenditures to reduce environmental hazards that were required to operate the facilities, and significant environmental liabilities that would be triggered in the event of a shutdown of the steel making facilities. *Id.* at 273, 275-76. The bankruptcy court recognized that the cash purchase price for those assets was reduced as a consequence of those capital expenditures and liabilities.

57.     With respect to the Fontainebleau Las Vegas Project, the capital expenditures and liabilities that the Retail Debtors would have been required to incur to complete the so-called "Air Rights Parcel" were twofold. First, under the Master Disbursement Agreement (Recital C, at 2), the Retail Debtors were liable to contribute $83 million in Shared Costs to

construct the Podium on which the Air Rights Parcel was to be situated.  As of February 2010, the Retail Debtors remained obligated to contribute about $49 million.

58.    Second, the Retail Debtors were responsible for payment of any tenant improvements and lease commissions required to attract tenants.  The original budget of the Retail Debtors to pay for such tenant improvements and lease commissions was $62 million. By the end of 2009, the ongoing tailspin of the Las Vegas retail market meant that landlords were forced to offer even more generous concessions in order to attract potential tenants.

59.    Accordingly, as of February 2010, the Retail Debtors – or any potential buyer of the Retail Debtors' interest in the real property sold to Icahn Nevada – would have been required to spend more than $100 million upfront in order to complete and enable the opening of the retail space.  In order to demonstrate that the value of the Air Rights Parcel was in excess of zero, the Retail Debtors would need to prove that the present value of the rental stream to be generated by the Air Rights Parcel would have exceeded the amount of those upfront costs.

60.    The Retail Debtors would be very hard pressed to make that showing.  In February 2010, the Retail Debtors – and any potential purchaser of their assets – were confronted with soaring vacancy rates and declining lease rates in the Las Vegas retail sector. As a result, the original projections that formed the basis for prior valuations of the Retail Debtors' interest in the Air Rights Parcel were, as of February 2010, no longer realistic. Further, under the Sale Order and APA, Icahn Nevada did not take assignment of any previously signed retail lease agreements, such as the lease agreement with the restaurant chain Nobu.  Thus, any valuation of the potential retail income stream that Icahn Nevada

34

acquired in February 2010 cannot be premised, as prior valuations were, on the above market lease rates to be paid under any preexisting signed lease agreements.

61.     Thus, even under a scenario where construction of the Project was somehow completed, the value of the Retail Debtors' assets was negative and thus worthless.  The cost that any purchaser of the Retail Debtors' interest in the Air Rights Parcel would have been required to incur in order to complete construction and generate an income stream vastly exceeded the present value of that income stream.  No willing third party buyer would have paid money for such an asset on a stand-alone basis.

62.     The substantial positive liquidation value of the Resort Debtors' assets, and the zero or negative value attributable to the Retail Debtors assets, suggest an allocation of less than $1 million to the Retail Debtors.  Given the risks of litigation faced by the Resort Debtors, along with the related costs and delay, the allocation of $1 million to the Retail Debtors is, at best for the Retail Debtors, at the highest end of the range of reasonable outcomes that they could hope to achieve in litigation.  Given the willingness of the creditors of the Resort Debtors to that allocation, this Court can and should find that the allocation to the Retail Debtors of $1 million is reasonable and that the Trustee is well within his business judgment in pursuing that resolution on behalf of the Retail Debtors.

63.     Trustee for Resort Debtors.  Under the Comprehensive Settlement Agreement, the estate for the Resort Debtors will receive the following benefits.  First, consistent with the Chapter 7 trustee's duty under section 704(a)(1) of the Bankruptcy Code to administer and close the estates as expeditiously as is compatible with the best interests of parties in interest, the settlement will finally allow for the administration of the Icahn Sale Proceeds, which have been locked up for three and a half years since the sale closed.  Second, under the

settlement, Wilmington, with the Turnberry Parties, will transfer the sum of about $49 million to the Trustee for the benefit of the Statutory Lienholders, which will be distributed to the Statutory Lienholders in satisfaction of the secured portion of their claims against the Resort Debtors. Third, the Statutory Lienholders have agreed to waive, relinquish and release any claims and rights arising under the District Court Order, which not only ensures that the Examiner and Professionals will never be required to disgorge payments made to them, but also ensures that the Trustee will be entitled to retain possession of and use approximately $3 million in proceeds from the DIP Financing that were turned over to the Trustee upon the conversion of these cases to chapter 7. Additionally, Wilmington and the Term Lenders are willing to acknowledge that, upon receipt of payment under the Comprehensive Settlement Agreement, they will not have liens on certain identified estate assets, thus providing certainty to the Trustee.

64.    The Comprehensive Settlement Agreement implements a process for determining rights and making distributions to the Statutory Lienholders, under which the Trustee preserves rights to object to both the allocation among the Statutory Lienholders and as to certain unsecured claims against the estates, thereby preserving the Trustee's rights and obligations with respect to the determination of claims. Finally, to accommodate the desires of the Statutory Lienholders to achieve some degree of finality as to whether they are current or potential targets of avoidance actions, the Trustee has agreed to list those Statutory Lienholders against whom the Trustee has determined, after thorough investigation and analysis, that avoidance action under chapter 5 of the Bankruptcy Code either (i) do not exist or (ii) have been settled or otherwise resolved. Importantly, the Trustee retains all rights against those Statutory Lienholders not identified in the Comprehensive Settlement

36

Agreement, and under any and all rights, claims, and actions under the applicable settlement agreements pursuant to which actions previously brought against Statutory Lienholders have been resolved.

65.    The Trustee will continue to investigate and retain the right to pursue avoidance actions under chapter 5 of the Bankruptcy Code, including against the Statutory Lienholders not released under the Comprehensive Settlement Agreement.  In light of the substantial benefits to the Trustee and the estate of the Resort Debtors resulting from the settlement and the Trustee's preservation of the right to pursue certain avoidance actions that he believes have value, the Trustee has concluded that the outcome falls within the range of reasonable outcomes.

### B.    Difficulties of Collection

66.    While difficulty of collection is not a factor with respect to allocation and distribution of the Icahn Sale Proceeds, which remain held by the Trustee in escrow pursuant to the Sale Order, the collectability is a factor with respect to several of the claims and proceedings to be resolved.  For example, in connection with the Completion Guaranty Litigation, Wilmington faces a number of challenges in collecting on the remaining $50 million portion of the judgment, such as the financial condition of Turnberry Residential, the competing liens asserted by Jacqueline Soffer, and the recovery of certain claims brought against the Soffers in Florida.

### C.    Complexity, Expense, Inconvenience and Delay

67.    This factor, perhaps more than any other, weighs heavily in favor of approval of the Comprehensive Settlement Agreement.  These bankruptcy cases have, for the parties and their counsel (and this Court), been difficult to untangle.  In part, this is because of the

multitude of parties that have an interest in the outcome of the proceedings, with claims and interests that are inextricably intertwined.  The Comprehensive Settlement Agreement involves five broad groups of interests:  1) Wilmington and the Term Lenders; 2) the Statutory Lienholders; 3) the Turnberry Parties; 4) the Trustee; and 5) the Title Companies. Within each of those groups is another multitude of constituents, whose interests and objectives are not always aligned.  As an example, the Statutory Lienholders consist of more than 300 claimants.  Complicating matters further is the fact that these cases are in chapter 7, meaning that the cramdown provisions and other tools under chapter 11 are not available to deal with dissenting minorities within the various groups.

68.    Also contributing to the complexity is the sheer number of proceedings that have been or remain subject to litigation, in a variety of different forums.  The Completion Guaranty Litigation alone has spawned litigation in New York state and appellate courts, Delaware state court, Florida state court, and Florida federal district court.  The Priority Litigation was referred by this Court to the Nevada Supreme Court and has now returned to this Court for further proceedings.  With respect to allocation of the Icahn Sale Proceeds, the parties have litigated and resolved disputes over allocation between real property and personal property assets, but have not yet litigated the allocation between the Retail Debtors and the Resort Debtors, and potential claims of lien or interest in cash or other funds in the possession of the Trustee or previously paid during the cases.  In addition, the appeal of the District Court Order remains pending before the Eleventh Circuit, and recently prompted a motion to enforce that order against Wilmington and the Term Lenders that was denied without prejudice by this Court.  The Title Companies have brought multiple proceedings in Florida state court against the Turnberry Parties, asserting causes of action for breach of

indemnity obligations and for breach of fiduciary duty and avoidance of fraudulent transfers. And if the Statutory Lienholders were to prevail in the Priority Litigation, there would likely be further proceedings commenced to determine the obligations of the Title Companies to Wilmington and the Term Lenders under the title policy.

69.    As this Court has seen first-hand, the issues and disputes raised in those various proceedings are factually and legally complex.   The Trustee's involvement in resolving the disputes among the Settlement Parties has expanded as the Settlement Parties have collectively endeavored to achieve a comprehensive resolution.   The issues and disputes of the various Settlement Parties are sufficiently interrelated that a global resolution is the most effective way to resolve the issues affecting the administration of the estate, and allow the Trustee to proceed with his duties in these cases.

70.    More than four years have passed since these bankruptcy cases were commenced, and three and a half years have passed since the closing of the Icahn Sale. During that period of time, the parties have collectively spent tens of millions of dollars in litigation and settlement discussions.   In the meantime, the Icahn Sale Proceeds have yet to be distributed, earning little if any interest and being depleted by the ongoing cost of maintaining a trustee's bond on those funds.

71.    Absent approval of the Comprehensive Settlement Agreement, the parties are facing many more years of delay, expense and inconvenience that would otherwise be required to allow for distribution of the Icahn Sale Proceeds and resolution of the related disputes.  The Comprehensive Settlement Agreement provides the means to cut the Gordian Knot that has otherwise been the metaphor of these bankruptcy cases.   Under the

circumstances, the prospect of further delay, inconvenience and expense weighs heavily in favor of approval of the Comprehensive Settlement Agreement.

**D.    The Paramount Interest of Creditors**

72.    Finally, the Comprehensive Settlement Agreement is in the best interests of the creditors and the Debtors' estates.  As described above, it will allow for an immediate distribution to creditors of proceeds that have been tied up in litigation for many years.  For that very reason, the Comprehensive Settlement Agreement has the support or consent of creditors of the Resort Debtors – Wilmington/Term Lenders, the Statutory Lienholders, and the Title Companies – that collectively hold about two-thirds of the anticipated allowed claims against the Debtors.

73.    Notably, the Comprehensive Settlement Agreement also has the support of significant creditors of the Retail Debtors, such as the Statutory Lienholders and the Title Companies.  The Statutory Lienholders' liens attach to any assets of the Retail Debtors (which constitute real property interests) and they assert priority over other liens on the Retail Debtors' assets, including any liens asserted by the Retail Lenders under applicable Nevada law, particularly in light of the Nevada Supreme Court's ruling.  If the Statutory Lienholders are correct, then they would be entitled to distribution of any proceeds allocated to the Retail Debtors.[14]  But under the Settlement, the Statutory Lienholders and other Parties have agreed not only to the allocation of the Icahn Sale Proceeds between the Retail Debtors and the Resort Debtors, but also that the Retail Lenders will receive distribution of the entire $1 million allocated to the Retail Debtors.  Although the Retail Lenders are not parties to the

---

[14] The Retail Lenders have not, during the pendency of these bankruptcy cases, challenged the priority under Nevada law of the liens asserted by the Statutory Lienholders.

Comprehensive Settlement Agreement, the settlement is in their best interest, given the alternative outcome that they would face in the absence of any settlement.

74.     Accordingly, each of the four factors under *Justice Oaks* weigh in favor of this Court's approval of the Comprehensive Settlement Agreement.

## II.    THE BAR ORDERS PROVIDED UNDER THE COMPREHENSIVE SETTLEMENT AGREEMENT ARE APPROPRIATE

75.     The Comprehensive Settlement Agreement provides for three separate bar orders and anti-suit injunctions: (a) the Completion Guaranty Bar Order, which enjoins Wilmington and each of the Beneficiaries under the Completion Guaranty (including Wilmington, the Lenders under the Credit Agreement, the indenture trustee under the Second Mortgage Notes Indenture, and the holders of Second Mortgage Notes) from pursuing claims against any Turnberry Party arising under or based upon the Completion Guaranty or the Completion Guaranty Judgment; (b) the Contractor Bar Order, which enjoins the Statutory Lienholders (and all other parties who have, or may have, mechanic's liens rights in the Fontainebleau Las Vegas Project) from pursuing claims against any Turnberry Party, the Term Lenders, Wilmington, the Title Companies, the court-appointed examiner (the "Examiner") and any professionals engaged by the Settlement Parties, the Examiner, the Debtors or the Official Committee of Unsecured Creditors (collectively, the "Professionals") based upon, arising out of, in connection with or related to the Fontainebleau Las Vegas Project; and (c) the Title Companies Bar Order, which enjoins Wilmington and the Lenders under the Credit Agreement from pursuing, against the Title Company Parties, claims that fall within the broad scope of the release to be provided by Lenders in the form attached as *Exhibit B-2* to the Title Companies/Lender Settlement Agreement

41

76.    In *Munford v. Munford, Inc.*(*In re Munford*), 97 F.3d 449 (11th Cir. 1996), the Eleventh Circuit affirmed the bankruptcy court's approval of a settlement bar order that applied to contribution and indemnity claims of nonsettling defendants.   The court held that 11 U.S.C. § 105(a), along with Rule 16 of the Federal Rules of Civil Procedure, conferred the bankruptcy court authority to enter a bar order in aid of settlement.   Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §§ 105(a) (1994) (emphasis added). Rule 16 which is incorporated in adversary proceedings under Rules of Bankruptcy 7016, states in pertinent part that "[a]t any [settlement] conference under this rule consideration may be given, and the court may take appropriate action, with respect to: . . . . (9) settlement and the use of special procedures to assist in resolving the dispute when authorized by statute or local rule." Fed. R. Civ. P. 16(9).

77.    As explained by the Eleventh Circuit, "section 105(a) and rule 16 taken together provide ample authority for the bankruptcy's court action.   Section 105(a) clearly provides that the bankruptcy court can enter 'any order' necessary or appropriate to carry out the provisions of the Bankruptcy Code, while rule 16 authorizes the use of special procedures to assist the parties in reaching a settlement." *Id.* at 455.

78.    In *Munford*, the Eleventh Circuit found that several justifications existed for the bankruptcy court to enter bar orders.   First, the court noted that public policy strongly favors pretrial settlement in all types of litigation because such cases, depending on their complexity, "can occupy a court's docket for years on end, depleting the resources of parties and the taxpayers while rendering meaningful relief increasingly elusive." *Id.*, citing *U.S. Oil & Gas v. Wolfson*, 967 F.2d 489, 493 (11th Cir. 1992).   Second, litigation costs are

particularly burdensome on a bankrupt estate given the financial instability of the estate. Third, "bar orders play an integral role in facilitating settlement" because "[d]efendants buy little peace through settlement unless they are assured that they will be protected against codefendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation." *Id.*, citing *U.S. Oil & Gas Litigation*, 967 F.2d at 494. The Eleventh Circuit expressly observed that, but for the bankruptcy court's bar order in that case, one of the parties would not have entered into the settlement agreement with the debtor.[15]

79.     Pursuant to the controlling *Munford* decision, in approving a bar order, a bankruptcy court may approve a settlement agreement containing a bar order if it is "fair and equitable". *Munford*, 97 F.3d at 455 (citing *U.S. Oil & Gas Litigation*, 967 F.2d 489, 496 (11th Cir. 1992) ("[w]hen determining whether to enter a bar order against non-settling defendants, the [c]ourt must make a reasoned determination that the bar order is fair and equitable"). The court should "consider the interrelatedness of the claims that the bar order precludes, the likelihood of nonsettling defendants to prevail on the barred claim, the complexity of the litigation, and the likelihood of depletion of the resources of the settling defendants." *Id.*

---

[15] Just recently, the Eleventh Circuit, citing *Munford*, affirmed a bar order issued by a bankruptcy court in the context of a Rule 9019 compromise in a chapter 7 case. *Apps v. Morrison (In re Superior Homes Investments, LLC)*, Case No. 12-15451, 2013 WL 2477057 at *2 (11th Cir. June 10, 2013). *See also, In re S&I Investments*, 421 B.R. 569, 583-586 (Bankr. S.D. Fla. 2009) (Ray, J.) (approving bar order as part of a settlement with the estate); *In re Certified HR Serv. Co.*, No. 05-22912-RBR, *Order Granting Motion of Liquidating Trustee James S. Feltman To Approve Settlement and Compromise* [ECF No. 2200] (Bankr. S.D. Fla. June 8, 2008) (Ray, J.); *In re First NLC Financial Serv. LLC.*, 2009 Bankr. LEXIS 1083 (Bankr. S.D. Fla. March 12, 2009) (Hyman, J.) (approving chapter 7 trustee's request for bar order as part of compromise motion).

80.    All of the above considerations favor approval of the Completion Guaranty Bar Order and Contractor Bar Order as fair and equitable in these cases.  As in *Munford*, each of the parties to the Comprehensive Settlement Agreement is seeking peace through settlement, and the Bar Orders are integral to the compromise and a material inducement to the beneficiaries of those Bar Orders.  The Turnberry Parties have made clear that, in the absence of the Completion Guaranty Bar Order, they are not prepared to enter into the Comprehensive Settlement Agreement.

81.    Likewise, the Turnberry Parties, Wilmington, the Term Lenders and the Trustee have made clear that they are not prepared to enter into the settlement if faced with the risk that any Statutory Lienholders may pursue future claims against them, or the Examiner or Professionals.  Given the enormous number of Statutory Lienholders and the logistical challenge of obtaining a signed release from each of those parties, the Contractor Bar Order provides a mechanism to ensure that the other Settlement Parties receive the benefit of their bargain.

82.    Each of the factors weigh in favor of a finding that the Bar Orders are fair and equitable:

　　　　　　　a.　　Any claims of parties under the Completion Guaranty and of the Statutory Lienholders are interrelated to the claims addressed by the Comprehensive Settlement Agreement, both as to allocation and distribution, and as to any claims being compromised and released.

　　　　　　　b.　　All nonsettling members of the groups including the Settlement Parties have significant risks in litigation, and face a wide-range of outcomes in the various pieces of litigation such that those parties will find it

difficult to succeed in any real and practical sense absent the allocation and other settlements reflected in the Comprehensive Settlement Agreement.

c.      As discussed above, the litigation resolved in the Comprehensive Settlement Agreement is broad, wide-ranging, interconnected, and otherwise exceedingly complex, and likely to require years to resolve if not resolved on a global basis.

d.      The depletion of resources of the Settlement Parties is a concern, both as to certain parties with limited resources, and as to the specific funds available for distribution from the Icahn Sale Proceeds, the Completion Guaranty, and the Title Companies.

83.     Importantly, each of the constituencies to be enjoined under the Bar Orders – the Statutory Lienholders, the Beneficiaries under the Completion Guaranty, and Wilmington and the Lenders under the Credit Agreement – will receive direct and substantial consideration under the Comprehensive Settlement Agreement.  The Statutory Lienholders will receive a distribution of about $85.3 million, preserve the right to pursue unsecured deficiency claims against the Debtors, and obtain a release from potential avoidance actions that might otherwise be pursued by the Trustee.  The Beneficiaries under the Completion Guaranty will benefit because Wilmington, as Disbursement Agent, will be in a position to earmark the Completion Guaranty Proceeds for the Statutory Lienholders without any objection by the Turnberry Parties, in exchange for which the Statutory Lienholders have agreed, pursuant to the Comprehensive Settlement Agreement, to allow the distribution of a substantial portion of the Icahn Sale Proceeds to Wilmington on behalf of the Lenders

45

(including the Term Lenders) under the Credit Agreement. Wilmington and the Lenders will receive payment of nearly $89 million, which would not be possible under the settlement in the absence of the contribution of $33.35 million by the Title Companies under the Comprehensive Settlement Agreement.

84.     Accordingly, under the standard set forth in *Munford*, the Bar Orders are appropriate and should be approved.

### Notice

85.     This Joint Motion has been served by transmission of notices of electronic filing generated by CM/ECF to all registered users in the Bankruptcy Cases, as well as those registered users in the adversary proceedings listed in *Exhibit A* to the Comprehensive Settlement Agreement under "Priority Disputes in Bankruptcy Court." The Parties request that the Court enter a separate order setting a final hearing on the Motion for November 13, 2013, and establishing procedures for objections to the Joint Motion, including a deadline of November 5, 2013 for filing objections to the Joint Motion. The Joint Motion and the order setting and establishing procedures in connection with a final hearing on the Joint Motion will be served upon the creditors and parties of interest in the Bankruptcy Cases, as well as those parties to the adversary proceedings listed in *Exhibit A* to the Comprehensive Settlement Agreement under "Priority Disputes in Bankruptcy Court," pursuant to Rules 2002 and 9019, Federal Rules of Bankruptcy Procedure.

WHEREFORE, the Settlement Parties respectfully request that the Court approve the Comprehensive Settlement Agreement, including the exhibits thereto, that are attached as *Exhibit 1*, enter an order in the form attached as *Exhibit 2* to this Joint Motion, and grant such further relief as the Court deems just and proper.

Dated: Tampa, FL
      October 15, 2013

STICHTER, RIEDEL, BLAIN & PROSSER, P.A.

By: /s/ *Russell M. Blain*
    Russell M. Blain (FL Bar No. 236314)
    110 East Madison Street, Suite 200
    Tampa, Florida 33602
    Telephone: (813) 229-0144
    Facsimile: (813) 229-1811
    *Counsel for Soneet R. Kapila, Chapter 7 Trustee*

-and-

GENOVESE JOBLOVE & BATTISTA, P.A.

By: /s/    *John H. Genovese*
    John H. Genovese (FL Bar No. 280852)
    Bank of America Tower at International Place
    100 Southeast Second Street, 44th Floor
    Miami, Florida 33131
    Telephone: (305) 349-2300
    Facsimile: (305) 349-2310
    *Special Litigation Counsel for Soneet R. Kapila, Chapter 7 Trustee*

**[Signature Pages to Follow]**

Dated:  Jacksonville, FL                    SMITH HULSEY & BUSEY
       October 15, 2013

                            By: /s/*James H. Post*
                                 Stephen D. Busey
                                 James H. Post (FL Bar No. 175460)
                                 225 Water Street, Suite 1800
                                 Jacksonville, Florida 32202
                                 Telephone:  (904) 359-7700
                                 Facsimile:  (904) 359-7708
                                 jpost@smithhulsey.com

                                     -and-

                          SEWARD & KISSEL LLP

                          By:/s/     *Mark J. Hyland*
                                 Mark J. Hyland (admitted *pro hac vice*)
                                 Jeffrey M. Dine (admitted *pro hac vice*)
                                 One Battery Park Plaza
                                 New York, New York  10004
                                 Telephone:  (212) 574-1200
                                 Facsimile:  (212) 901-2110

                                 *Attorneys for Wilmington Trust N.A.,*
                                 *as Administrative Agent*

**[Signature Pages to Follow]**

Dated: Los Angeles, CA
       October 15, 2013

JONES DAY


By: /s/    *Sidney P. Levinson*
    Sidney P. Levinson (admitted *pro hac vice*)
    555 South Flower Street, 50th Floor
    Los Angeles, CA  90071
    Telephone:  (213) 489-3939
    Facsimile:  (213) 243-2539


-and-


AKERMAN SENTERFITT


By: /s/    *Michael I. Goldberg*
    Michael I. Goldberg (FL Bar No. 886602)
    Las Olas Centre II
    One Southeast Third Avenue, 25th Floor
    Miami, Florida  33131-1714
    Telephone:  (305) 374-5600
    Facsimile:  (305) 374-5095

    *Counsel for the Term Lenders*


**[Signature Pages to Follow]**

Dated:  Las Vegas, Nevada
        October 15, 2013

GORDON SILVER


By: /s/    *Gabrielle A. Hamm*
    Gregory E. Garman (admitted *pro hac vice*)
    Gabrielle A. Hamm (admitted *pro hac vice*)
    3960 Howard Hughes Parkway, Ninth Floor
    Las Vegas, Nevada  89169
    Telephone:  (702) 796-5555
    Facsimile:  (702) 369-2666

              -and-

By: /s/    *Philip J. Landau*
    Shraiberg,  Ferrara & Landau, P.A.
    Philip J. Landau (FL Bar No. 504017)
    2385 N.W. Executive Center Drive
    Suite 300
    Boca Raton, Florida  33431
    Telephone:  (561) 443-0800
    Facsimile:  (561) 998-0047

    *Co-Lead Counsel for the Mechanic Lien*
    *Defendants, Co-Counsel for the Steering*
    *Committee and Counsel for the M&M*
    *Lienholders*


**[Signature Pages to Follow]**

Dated:  Miami, Florida
       October 15, 2013

EHRENSTEIN CHARBONNEAU CALDERIN


By: /s/    *Daniel L. Gold*
     Robert Charbonneau (FL Bar No. 968234)
     Daniel L. Gold (FL Bar No. 0761281)
     501 Brickell Key Drive, Third Floor
     Miami, Florida  33131
     Telephone:  (305) 722-2002
     Facsimile:  (305) 722-2001

     *Co-Lead Counsel for the Mechanic Lien*
     *Defendants, Co-Counsel for the Steering*
     *Committee and Counsel for JMB Capital*
     *Partners Master Fund, LP*

**[Signature Pages to Follow]**

Dated:  Miami, Florida       RICHARD AND RICHARD, P.A
       October 15, 2013

By: /s/    *Dennis Richard*
    Dennis Richard (FL Bar No. 148730)
    825 Brickell Bay Dr Ste 1748
    Miami, Florida
    Phone:  (305) 374-6688
    Facsimile: (305) 374-0384

    *Counsel for the Turnberry Residential Limited*
    *Partner, L.P.*

**[Signature Pages to Follow]**

Dated:  Weston, Florida
        October 15, 2013

SHAWDE & EATON, P.L.


By: /s/    *John D. Eaton*
    _____
    John D. Eaton (Florida Bar No. 0861367)
    1792 Bell Tower Lane
    Weston, Florida  33326
    Telephone:  (954) 376-3366
    Facsimile:  (954) 376-3171

    *Counsel for Turnberry West Construction, Inc.*

**[Signature Pages to Follow]**

Dated:  Miami, Florida
        October 15, 2013

WALDMAN TRIGOBOFF HILEBRANDT
MARX & CALNAN, P.A.


By: /s/    *Craig J. Trigoboff*
    Craig J. Trigoboff (FL Bar No. 0880541)
    Broward Financial Center/ Suite 1700
    500 East Broward Boulevard
    Fort Lauderdale, Florida 33394
    Phone:  (954) 467-8600
    Facsimile:  (954) 467-6222

    *Counsel for Fontainebleau Resorts, LLC*


**[Signature Pages to Follow]**

Dated: Miami, Florida                RICHARD AND RICHARD, P.A
       October 15, 2013


By: /s/     *Dennis Richard*
    Dennis Richard (FL Bar No. 148730*)*
    825 Brickell Bay Dr Ste 1748
    Miami, Florida
    Phone:  (305) 374-6688
    Facsimile: (305) 374-0384

    *Counsel for the Turnberry, LTD.*

**[Signature Pages to Follow]**

Dated:  Miami, Florida
        October 15, 2013

BERGER SINGERMAN LLP


By: /s/    *Isaac M. Marcushamer*
    Isaac M. Marcushamer (FL Bar No. 60373)
    1450 Brickell Avenue, Suite 1900
    Miami, Florida  33131
    Phone:  (305) 755-9500
    Facsimile:  (305) 714-4340

    *Counsel for the Jeffrey Soffer and Jacqueline*
    *Soffer*


**[Signature Pages to Follow]**

Dated:  Miami, Florida
       October 15, 2013

LEVINE KELLOGG LEHMAN SCHNEIDER & GROSSMAN

By: /s/ *David M. Levine*
    David M. Levine (FL Bar No. 0328731)
    201 South Biscayne Boulevard
    Miami Center – 34th Floor
    Miami, Florida  33131
    Telephone:  (305) 403-8788
    Facsimile:  (305) 403-8789

    *Counsel for the Title Companies*

**[End of Signature Pages]**