2.11    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.12    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.13    With respect to this Release, the Term Lenders, Wilmington and the Title Companies have not made any statement or representation to the Statutory Lienholders regarding any fact which statement or representation the Statutory Lienholders has relied upon.

2.14    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.15    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

Title Companies:

Each of the Title Companies expressly acknowledges that:

2.16    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.17    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.18    With respect to this Release, the Statutory Lienholders have not made any statement or representation to the Title Companies regarding any fact which statement or representation the Title Companies have relied upon.

2.19    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.20    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

3.    DISMISSAL WITH PREJUDICE OF THE CASES:  Wilmington and the Statutory Lienholders shall irrevocably and unconditionally execute and deliver to the Parties stipulations of dismissal with prejudice for each of the Cases listed in Exhibit A to the Comprehensive Settlement Agreement under the heading "Priority Disputes in Bankruptcy Court," on or before the Effective Date.

4.    RELEASE BY STATUTORY LIENHOLDERS:  Except for the Term Lenders', Wilmington's and the Title Companies' express obligations under the Comprehensive Settlement Agreement and this Release, and subject in all respect to the limits of Paragraph 8 of this Release, each Statutory Lienholder, on behalf of itself and on behalf of its respective former, present and future parents, affiliates (to the extent empowered to act on their behalf), subsidiaries and successor entities, and assigns, special purpose entities, trustees, conservators, receivers and representatives with respect to the Fontainebleau Project, and each of their professionals retained in connection with any of the Cases, hereby fully and forever waives, relinquishes, releases and discharges the Term Lenders, Wilmington and the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense),

EXHIBIT B-6

indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with, the Fontainebleau Project, and/or all of the Cases. For avoidance of doubt, the Statutory Lienholders waive, relinquish and otherwise release any claim against any of the Parties, as well as the Examiner and any professionals engaged by the parties, the Examiner, the Trustee, the Debtors and the Committee, arising from the opinion issued on July 14, 2010 by the United States District Court for the Southern District of Florida in *Desert Fire Protection v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC*, Docket No. 1:09-23683 (S.D. Fla.). This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Each of the Statutory Lienholders expressly contracts to release the Term Lenders, Wilmington and the Title Company Parties from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Project, and/or Cases (other than as is specifically provided for in this Release or the Comprehensive Settlement Agreement).

     5.    <u>RELEASE BY WILMINGTON</u>: Except for the Statutory Lienholders express obligations under the Comprehensive Settlement Agreement and this Release and subject in all respects to the limits in Paragraph 8 of this Release, Wilmington, on behalf of itself and on behalf of its respective former, present and future parents, affiliates (to the extent empowered to act on their behalf), subsidiaries and successor entities, and assigns, special purpose entities, trustees, receivers, conservators, and representatives with respect to the Fontainebleau Project, and each of their professionals retained in connection with any of the Cases, hereby fully and forever waives, relinquishes, releases and discharges the Statutory Lienholders of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with, the Fontainebleau Project, and/or all of the Cases. This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Wilmington expressly contracts to release the Statutory Lienholders from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Project, and/or Cases (other than as is otherwise specifically provided for in this Release or the Comprehensive Settlement Agreement).

6.    RELEASE BY TITLE COMPANIES:    Except for the Statutory Lienholders' express obligations under the Comprehensive Settlement Agreement and this Release, and subject in all respects to the limits in Paragraph 8 of the Release, each of the Title Companies, on behalf of itself and on behalf of its respective former, present and future parents, affiliates (to the extent empowered to act on their behalf), subsidiaries and successor entities, and assigns, and representatives with respect to the Fontainebleau Project, special purpose entities, trustees, conservators, receivers, and rehabilitators, and each of their professionals retained in connection with any of the Cases, hereby fully and forever waives, relinquishes, releases and discharges the Statutory Lienholders of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with, the Fontainebleau Project, and/or all of the Cases.  This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties.  (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Each of the Title Companies expressly contracts to release the Statutory Lienholders from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Project, and/or Cases (other than as is otherwise specifically provided for in this Release or the Comprehensive Settlement Agreement).

7.    RELEASE BY THE TERM LENDERS:    Except for the express obligations of the Parties (other than the Term Lenders) under the Comprehensive Settlement Agreement and this Release, and subject in all respects to the limits in Paragraph 8 of this Release, each of the Term Lenders, on behalf of themselves and on behalf of each of their respective agents, owners, servicers, affiliates (to the extent empowered to act on their behalf), parents, subsidiaries and successor entities, and assigns, special purpose entities, trustees, conservators, receivers, and representatives with respect to the Fontainebleau Project, and each of their professionals retained in connection with the Fontainebleau Project and/or any of the Cases, hereby fully and forever waives, relinquishes, releases and discharges the Statutory Lienholders of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with, the Fontainebleau Project, and/or all of the Cases.  This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties.  (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001)

6

117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). The Term Lenders expressly contract to release the Statutory Lienholders from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Project, and/or Cases (other than as is otherwise specifically provided for in this Release or the Comprehensive Settlement Agreement).

8.      **RELEASE DOES NOT INCLUDE**.  Notwithstanding anything in this Release to the contrary, the releases provided for above (i) shall not include the release of claims or previously filed proofs of claim of the Parties against the Resort Debtors or the Retail Debtors; (ii) shall not include claims or rights of the Term Lenders under any settlement agreement arising under or related to the Parent Guaranty and Resort Properties I Guaranty; (iii) except as set forth in the Completion Guaranty Bar Order and the Contractor Bar Order, shall not bar claims by third parties against the Turnberry Parties for contribution, indemnity or subrogation; (iv) shall not include any claims asserted by the Trustee against Turnberry and other parties, including those asserted in the Kapila Action; (v) shall not include any claims, counter-claims, cross-claims or affirmative defenses now or hereafter asserted by any party in the Brigade Action, or non-contract claims that could be asserted by or on behalf of holders of Term Loans or their predecessors, successors or assigns (all solely in their capacity as holders of Term Loans) arising out of or related to the facts asserted in the Brigade Action; (vi) shall apply only to claims held by the Term Lenders in their capacity as holders of Term Loans, and not to claims held in any other capacity, including without limitation any claims in their capacity as holders of the Second Mortgage Notes issued under the Second Mortgage Notes Indenture; (vii) shall apply only to claims held by Wilmington in its capacity as Administrative Agent under the Credit Agreement and Disbursement Agent under the Master Disbursement Agreement; and (viii) shall not include and shall expressly preserve the Title Companies' defenses under the Retail Title Policy and the Second Lien Title Policy, including as against US Bank, Successor Trustee, and the holders of the Second Mortgage Notes. Further, the scope and effect of the releases granted hereunder shall be limited and interpreted so as not to impair or otherwise affect any claims against third parties other than the Turnberry Parties that have been or could be asserted by the Term Lenders, including, without limitation, claims asserted against (a) the Resort Debtors, (b) the Retail Debtors, (c) Bank of America, and/or (d) the defendants in the Brigade Action and the Trustee Action.

9.      SUCCESSORS AND ASSIGNS.  This Release shall be binding upon and inure to the benefit of the Parties and their successors and assigns, including any reorganized entity or any trustee or fiduciary that may be appointed or elected pursuant to the Bankruptcy Code or other applicable law. This Release shall remain in full force and effect notwithstanding the entry of any subsequent order, judgment, or decree by any court, arbitration panel or other tribunal, avoiding or nullifying any transfers or transactions with respect to any of the Parties or their successors or assigns.

10.      GOVERNING LAW:  This Release shall be construed in accordance with, and governed in all respects by, the laws of the State of Nevada.

11.      FURTHER DISPUTE RESOLUTION:   Any litigation arising out of, under, or in connection with this Release shall be brought and maintained exclusively in the Bankruptcy Court. The Parties irrevocably and unconditionally submit, for themselves and their property, to the exclusive jurisdiction of the Bankruptcy Court, and expressly waive the right to

any other jurisdiction to which they may be entitled by reason of their present or future domicile or otherwise.

        12.   <u>RECITALS</u>. The Recitals are incorporated herein by this reference and made a part hereof.

        13.   <u>EFFECTIVENESS.</u>  For avoidance of doubt, this Release shall be null, void and without effect if the Effective Date of the Comprehensive Settlement Agreement does not occur.

*[Signatures contained on following page]*

<u>EXHIBIT B-6</u>

**SO AGREED BY THE TERM LENDERS:**


LENDER:  BRIGADE LEVERAGED CAPITAL STRUCTURES          Date:  July ___, 2013
                FUND, LTD.

By:    _____

       Doug Pardon

Its:   _____


LENDER:  BATTALION CLO 2007-1          Date:  July ___, 2013

By:    _____

       Doug Pardon

Its:   _____

**SO AGREED BY THE TERM LENDERS:**

LENDER:  CANPARTNERS INVESTMENTS IV, LLC                Date:  July ___, 2013
By: _____
          Jonathan M. Kaplan
Its:     General Counsel


LENDER:  CANYON SPECIAL OPPORTUNITIES MASTER         Date:  July ___, 2013
              FUND (CAYMAN), LTD.
By: _____
          Jonathan M. Kaplan
Its:     General Counsel

**SO AGREED BY THE TERM LENDERS:**

LENDER:  CASPIAN CAPITAL PARTNERS, L.P.       Date:  July ___, 2013
By:     _____
       David Corleto
Its:    Principal

LENDER:  CASPIAN SELECT CREDIT MASTER FUND, LTD.       Date:  July ___, 2013
By:     _____
       David Corleto
Its:    Principal

LENDER:  MARINER LDC       Date:  July ___, 2013
By:     _____
       David Corleto
Its:    Principal

LENDER:  CASPIAN ALPHA LONG CREDIT FUND, L.P.       Date:  July ___, 2013
By:     _____
       David Corleto
Its:    Principal

LENDER:  CASPIAN SC HOLDINGS LP       Date:  July ___, 2013
By:     _____
       David Corleto
Its:    Principal

LENDER:  CASPIAN SOLITUDE MASTER FUND, L.P.       Date:  July ___, 2013
By:     _____
       David Corleto
Its:    Principal

**SO AGREED BY THE TERM LENDERS:**

LENDER: ING PRIME RATE TRUST                                    Date: July ___, 2013
By:    ING Investment Management Co., as its investment manager
By:    _____
       Robert Wilson
Its:   Senior Vice President


LENDER: ING SENIOR INCOME FUND                                 Date: July ___, 2013
By:    ING Investment Management Co., as its investment manager
By:    _____
       Robert Wilson
Its:   Senior Vice President


LENDER: ING INTERNATIONAL (II) SENIOR BANK LOAN                Date: July ___, 2013
            EURO
By:    ING Investment Management Co., as its investment manager
By:    _____
       Robert Wilson
Its:   Senior Vice President


LENDER: ING INVESTMENT MANAGEMENT CLO I, LTD.                  Date: July ___, 2013
By:    ING Investment Management Co., as its investment manager
By:    _____
       Robert Wilson
Its:   Senior Vice President


LENDER: ING INVESTMENT MANAGEMENT CLO II, LTD.                 Date: July ___, 2013
By:    ING Alternative Asset Management LLC, as its investment
       manager
By:    _____
       Robert Wilson
Its:   Senior Vice President

LENDER:  ING INVESTMENT MANAGEMENT CLO III, LTD.          Date:  July ___, 2013
By:     ING Alternative Asset Management LLC, as its investment
        manager
By:     _____
        Robert Wilson
Its:    Senior Vice President


LENDER:  ING INVESTMENT MANAGEMENT CLO IV, LTD.          Date:  July ___, 2013
By:     ING Alternative Asset Management LLC, as its investment
        manager
By:     _____
        Robert Wilson
Its:    Senior Vice President


LENDER:  ING INVESTMENT MANAGEMENT CLO V, LTD.          Date:  July ___, 2013
By:     ING Alternative Asset Management LLC, as its investment
        manager
By:     _____
        Robert Wilson
Its:    Senior Vice President


LENDER:  PHOENIX CLO I, LTD.          Date:  July ___, 2013
By:     ING Alternative Asset Management LLC, as its investment
        manager
By:     _____
        Robert Wilson
Its:    Senior Vice President


LENDER:  PHOENIX CLO II, LTD.          Date:  July ___, 2013
By:     ING Alternative Asset Management LLC, as its investment
        manager
By:     _____
        Robert Wilson
Its:    Senior Vice President

EXHIBIT B-6

LENDER:  PHOENIX CLO III, LTD.                          Date:  July ___, 2013
By:     ING Alternative Asset Management LLC, as its investment
        manager
By:     _____
        Robert Wilson
Its:    Senior Vice President

EXHIBIT B-6

**SO AGREED BY THE TERM LENDERS:**


LENDER:  VENTURE II CDO 2002, LIMITED                          Date:  July ___, 2013
By:     MJX Asset Management, LLC, as its investment advisor

By:     _____
        Simon Yuan
Its:    Director


LENDER:  VENTURE III CDEO LIMITED                              Date:  July ___, 2013
By:     MJX Asset Management, LLC, as its investment advisor

By:     _____
        Simon Yuan
Its:    Director


LENDER:  VENTURE IV CDO LIMITED                                Date:  July ___, 2013
By:     MJX Asset Management, LLC, as its investment advisor

By:     _____
        Simon Yuan
Its:    Director


LENDER:  VENTURE V CDO LIMITED                                 Date:  July ___, 2013
By:     MJX Asset Management, LLC, as its investment advisor

By:     _____
        Simon Yuan
Its:    Director

LENDER:  VENTURE VI CDO LIMITED                          Date:  July ___, 2013
By:    MJX Asset Management, LLC, as its investment advisor

By:    _____
       Simon Yuan
Its:   Director


LENDER:  VENTURE VII CDO LIMITED                         Date:  July ___, 2013
By:    MJX Asset Management, LLC, as its investment advisor

By:    _____
       Simon Yuan
Its:   Director


LENDER:  VENTURE VIII CDO LIMITED                        Date:  July ___, 2013
By:    MJX Asset Management, LLC, as its investment advisor

By:    _____
       Simon Yuan
Its:   Director


LENDER:  VENTURE IX CDO LIMITED                          Date:  July ___, 2013
By:    MJX Asset Management, LLC, as its investment advisor

By:    _____
       Simon Yuan
Its:   Director


LENDER:  VISTA LEVERAGED INCOME FUND                     Date:  July ___, 2013
By:    MJX Asset Management, LLC, as its investment advisor

By:    _____
       Simon Yuan
Its:   Director

EXHIBIT B-6

LENDER:  VEER CASH FLOW CLO LIMITED          Date:  July ___, 2013
By:    MJX Asset Management, LLC, as its investment advisor

By:    _____
       Simon Yuan
Its:   Director

EXHIBIT B-6

**SO AGREED BY THE TERM LENDERS:**

LENDER:  MONARCH MASTER FUNDING, LTD.          Date:  July ___, 2013
By:      Monarch Alternative Capital LP
Its:     Advisor
By:      _____
By:
Its:     _____

**SO AGREED BY THE TERM LENDERS:**

LENDER:  MORGAN STANLEY SENIOR FUNDING, INC.          Date:  July ___, 2013
By:       _____

Its:      _____

**SO AGREED BY THE TERM LENDERS:**


LENDER:  SPCP GROUP LLC                                  Date:  July ___, 2013
By:     Silver Point Capital, L.P., as investment manager
By:     _____
        Vick Sandhu
Its:    Authorized Signatory

**SO AGREED BY THE TERM LENDERS:**

LENDER: SOLA LTD.                                    Date: July ___, 2013
By:    Solus Alternative Asset Management LP, as its investment
       manager
By:    _____
       Christopher Bondy
Its:   Executive Vice President


LENDER: SOLUS CORE OPPORTUNITIES MASTER FUND          Date: July ___, 2013
By:    Solus Alternative Asset Management LP, as its investment
       manager
By:    _____
       Christopher Bondy
Its:   Executive Vice President


LENDER: SOLUS CORE OPPORTUNITIES LP                  Date: July ___, 2013
By:    Solus Alternative Asset Management LP, as its investment
       manager
By:    _____
       Christopher Bondy
Its:   Executive Vice President


LENDER: SOLUS RECOVER FUND LP                        Date: July ___, 2013
By:    Solus Alternative Asset Management LP, as its investment
       manager
By:    _____
       Christopher Bondy
Its:   Executive Vice President

EXHIBIT B-6

LENDER:  ULTRA MASTER, LTD.                          Date:  July ___, 2013

By:     Solus Alternative Asset Management LP, as its investment
        manager

By:     _____

        Christopher Bondy

Its:    Executive Vice President

EXHIBIT B-6

**SO AGREED BY THE TERM LENDERS:**


LENDER:  VENOR CAPITAL MASTER FUND LTD.                Date:  July ____, 2013
By:       _____
          Michael Wartell
Its:      Authorized Signatory


23
<u>EXHIBIT B-6</u>

**SO AGREED BY THE TITLE COMPANIES**:

FIDELITY NATIONAL TITLE INSURANCE COMPANY          Date: June ___, 2013
By: _____
Its:_____

FIDELITY NATIONAL TITLE INSURANCE COMPANY AS
SUCCESSOR BY MERGER FOR LAWYERS TITLE
INSURANCE CORPORATION                             Date: June ___, 2013
By: _____
Its:_____

COMMONWEALTH LAND TITLE INSURANCE COMPANY          Date: June ___, 2013
By: _____
Its:_____

COMMONWEALTH LAND TITLE INSURANCE COMPANY AS
SUCCESSOR BY MERGER TO TRANSNATION TITLE
INSURANCE COMPANY                                Date: June ___, 2013
By: _____
Its:_____

ALAMO TITLE INSURANCE                            Date: June ___, 2013
By: _____
Its:_____

CHICAGO TITLE AND TRUST COMPANY                  Date: June ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY                  Date: June ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY AS SUCCESSOR
BY MERGER TO TICOR TITLE INSURANCE COMPANY       Date: June ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY AS SUCCESSOR
BY MERGER TO TICOR TITLE INSURANCE
COMPANY OF FLORIDA                               Date: June ___, 2013
By: _____
Its:_____

EXHIBIT B-6

CHICAGO TITLE INSURANCE COMPANY AS SUCCESSOR BY
MERGER TO SECURITY UNION TITLE INSURANCE COMPANY   Date: June ___, 2013
By: _____
Its:_____


FIRST AMERICAN TITLE INSURANCE COMPANY   Date: June ___, 2013
By: _____
Its:_____

**SO AGREED BY WILMINGTON**:

WILMINGTON TRUST, N.A.   Date: June ___, 2013
By: _____
Its:_____

25
<u>EXHIBIT B-6</u>

**SO AGREED BY THE STATUTORY LIENHOLDERS:**

JMB CAPITAL MANAGEMENT                              Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____


Statutory Lienholder: _____        Date:  July ___, 2013
By:      _____
Its:     _____

EXHIBIT B-6

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013
By:        _____
Its:       _____

Statutory Lienholder: _____          Date:  July ___, 2013

27
EXHIBIT B-6

By: _____
Its: _____

Statutory Lienholder: _____          Date: July ___, 2013
By: _____
Its: _____

Statutory Lienholder: _____          Date: July ___, 2013
By: _____
Its: _____

Statutory Lienholder: _____          Date: July ___, 2013
By: _____
Its: _____

EXHIBIT B-6

# EXHIBIT B-7

## MUTUAL RELEASES BY THE TITLE COMPANIES, FONTAINEBLEAU RESORTS, LLC, TURNBERRY, LTD., TURNBERRY WEST CONSTRUCTION, INC., TURNBERRY RESIDENTIAL LIMITED PARTNER, L.P., JEFFREY SOFFER AND JACQUELYN SOFFER

Policy No.: 08500442 (1st) (K56-0012592)
Date of Policy: June 7, 2007

This release ("Release") is entered into, by and among: the Title Companies (defined below in Recital "A"), Fontainebleau Resorts, LLC ("FBR"), Turnberry West Construction, Inc. ("TWC"), Turnberry, Ltd. ("Turnberry"), Turnberry Residential Limited Partner, L.P. ("TRLP"), Jeffrey Soffer ("Jeff") and Jacquelyn Soffer ("Jackie") (collectively, the forgoing are the "Parties"). Unless provided otherwise, all capitalized terms in this Release shall have the meanings ascribed to them in the Title Companies/Lender Settlement Agreement and the Comprehensive Settlement Agreement.

### RECITALS

A.    The "Title Companies" are Fidelity National Title Insurance Company; Fidelity National Title Insurance Company as successor by merger to Lawyers Title Insurance Corporation; Commonwealth Land Title Insurance Company; Commonwealth Land Title Insurance Company as successor by merger to Transnation Title Insurance Company; Alamo Title Insurance; Chicago Title and Trust Company; Chicago Title Insurance Company; Chicago Title Insurance Company as successor by merger to Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, and Security Union Title Insurance Company; and First American Title Insurance Company.

B.    "Title Company Parties" means the Title Companies and each of their parent, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters (including the Fontainebleau Project), the Indemnity Case and the Negligence Case.

C.    The term "Fontainebleau Las Vegas Matters" for the purpose of this Release shall mean the 2006 ALTA Loan Policy No. 08500442 (1st) (K56-0012592) issued by the Title Companies ("First Lien Title Policy"), the 1992 ALTA Loan Policy No. 08500442 (2nd) (K56-0012592) issued by the Title Companies (the "Second Lien Title Policy"), claims tendered under the First Lien Title Policy and the Second Lien Title Policy and/or which have been or could be asserted against the Title Companies, relative to the acquisition, development, construction ownership and/or operation of the Fontainebleau Las Vegas Resort & Casino (collectively, the "Fontainebleau Project"), the Icahn Sale Proceeds, the Available Disbursement Funds (including the Icahn Sale Proceeds Balance and the Completion Guaranty Proceeds Account), statutory liens relative to the Fontainebleau Project, the Bankruptcy Proceedings (as such term is defined herein), the adversary proceedings filed in connection with Case No. 09-21481-BK-AJC (Bankr. S.D. Fla.), the senior loans advanced by the current holders of such loans (including holders of Term Loans, Revolving Loans, and Hedge obligations) under the Credit Agreement, the Credit Agreement (as such term is defined herein), Master Disbursement Agreement (as such term is defined in the Credit Agreement) and the Order on remand entered on July 14, 2010 by Judge

FNTI\48138\913752.1

1

Altonaga, the United States District Court for the Southern District of Florida, and the related appeals; provided, however, that for avoidance of doubt, Fontainebleau Las Vegas Matters shall not include any claims, rights, defenses, causes of action and disputes arising under or related to the 1992 ALTA Loan Policy No. 08500442 (Retail Leasehold) coinsured by Lawyer's Title Insurance Corp., Transnation Title Insurance Company and Commonwealth Land Title Insurance Co. (the "Retail Title Policy").

D.      Fidelity National Title Insurance Company, Lawyers Title Insurance Corporation, Commonwealth Land Title Insurance Company, Transnation Title Insurance Company Alamo Title Insurance, Chicago Title and Trust Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, Security Union Title Insurance Company and First American Title Insurance Company (collectively, the "Indemnity Case Plaintiffs") are plaintiffs in Case No. 09-75602 CA-40, pending in the Eleventh Judicial Circuit Court In and For Miami-Dade County, Florida (the "Indemnity Case") against defendants FBR, TWC, TRLP, Jeff and Jackie (collectively, the "Indemnity Case Defendants").  Pursuant to the Indemnity Case Plaintiffs' Third Amended Complaint, they have asserted four fraudulent transfer claims under Chapter 726, Florida Statutes, and a breach of indemnity claim concerning a written indemnity agreement between the Indemnity Case Plaintiffs and TRLP, TWC and FBR and executed on June 5, 2007 ("Indemnity Agreement").  The Indemnity Case Defendants have denied all material allegations against them and asserted affirmative defenses to the Indemnity Case Plaintiffs' claims.

E.      Fidelity National Title Insurance Company, Lawyers Title Insurance Corporation, Commonwealth Land Title Insurance Company, Transnation Title Insurance Company, and First American Title Insurance Company (collectively, the "Negligence Case Plaintiffs") are plaintiffs in Case No. 10-20339 CA-40, pending in the Eleventh Judicial Circuit Court In and For Miami-Dade County, Florida (the "Negligence Case") against defendant Jeff.  Pursuant to the Negligence Case Plaintiffs' Fourth Amended Complaint against Jeff, they have asserted a negligence claim and a claim for negligent misrepresentation.  Jeff has denied all material allegations against him and asserted affirmative defenses to the Negligence Case Plaintiffs' claims.

F.      The Title Companies, Wilmington Trust, N.A., successor to Wilmington Trust, FSB ("Wilmington"), the Term Lenders (as defined in the June 6, 2007 Credit Agreement among Fontainebleau Las Vegas LLC, and Fontainebleau Las Vegas II, LLC, as borrowers, and Bank of America, N.A., as Administrative Agent, hereinafter the "Credit Agreement") represented by the law firms Jones Day and Akerman Senterfitt, who, together, constitute the Required Lenders under the Credit Agreement (collectively, the "Term Lender Group") have executed a settlement agreement ("Title Companies/Lender Settlement Agreement") that is expressly conditioned upon the execution of this Release by the Parties and delivery of a stipulation of dismissal with prejudice of the Indemnity Case and the Negligence Case, with each Party to bear its own fees and costs through the date(s) of dismissal.

G.      Lawyers Title Insurance Corporation, Commonwealth Land Title Insurance Company and Transnation Title Insurance Company are plaintiffs in Case No.: 10-14719-CA-40, pending in the Eleventh Judicial Circuit Court In and For Miami-Dade County, Florida against defendant FBR ("Retail Case"), and related claims to those asserted in the Retail Case were asserted by claims filed by the Title Companies in the jointly administered bankruptcy cases,

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

styled *In re Fontainebleau Las Vegas Holdings, LLC et al.*, Case No. 09-21481-BKC-AJC (Bankr. S.D. Fla.) ("Bankruptcy Proceedings"), which were converted from Chapter 11 to Chapter 7 (collectively the forgoing case and bankruptcy claims are the "Title Companies Retail Indemnity Claims"). FBR has denied all material allegations against it in the Retail Case and has asserted affirmative defenses to the Title Companies Retail Indemnity Claims.

H.    The Title Companies/Lender Settlement Agreement is expressly conditioned upon the Parties entering into a tolling agreement with respect to the Title Companies Retail Indemnity Claims, so the Title Companies preserve the Title Companies Retail Indemnity Claims (and correspondingly FBR preserves its denials and affirmative defenses in respect thereto), and delivery of a stipulation of dismissal without prejudice of the Title Companies Retail Indemnity Claims, with each of the Parties to bear their own fees and costs through the date(s) of dismissal.

I.    FBR, TWC, TRLP, Jeff, Turnberry, and Jackie executed a settlement agreement ("Comprehensive Settlement Agreement") with certain members of the Term Lender Group and others, pursuant to which, they agreed to grant a release to the Title Companies (in exchange for the benefits identified therein), as set forth in this Release. This Release shall be immediately effective upon the Effective Date of the Title Companies/Lender Settlement Agreement.

NOW THEREFORE, in consideration of the promises and undertakings set forth in the Title Companies/Lender Settlement Agreement and herein, and upon and subject to the Effective Date of the Title Companies/Lender Settlement Agreement, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    REPRESENTATIONS AND WARRANTIES:

Title Companies:
1.1    The Recitals set forth above are true and correct and are fully incorporated herein.
1.2    The undersigned Title Companies have obtained all consents and approvals and have taken all corporate or charter action necessary to authorize the execution and delivery of this Release.
1.3    Each of the Title Companies has fully authorized the person executing this Release to do so on its behalf.
1.4    Each of the Title Companies warrants that the Release constitutes a legal, valid and binding release enforceable against it in accordance with its terms.

FBR
1.5    The Recitals set forth above are true and correct and are fully incorporated herein.
1.6    FBR has obtained all consents and approvals and has taken all corporate or charter action necessary to authorize the execution and delivery of this Release.
1.7    FBR has fully authorized the person executing this Release to do so on its behalf.
1.8    FBR warrants that the Release constitutes a legal, valid and binding release enforceable against it in accordance with its terms.

FNTM48138\913752.1                                    3
EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

1.9    FBR, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, warrants that it does not hold Second Mortgage Notes, directly or indirectly, and that it will not acquire Second Mortgage Notes, directly or indirectly, after the Effective date of the Title Companies/Lender Settlement Agreement. To the extent that FBR holds Second Mortgage Notes, directly or indirectly, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, FBR covenants, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, that it will not sue or seek a recovery from the Title Company Parties as a holder of Second Mortgage Notes.

TWC
1.10    The Recitals set forth above are true and correct and are fully incorporated herein.

1.11    TWC has obtained all consents and approvals and has taken all corporate or charter action necessary to authorize the execution and delivery of this Release.

1.12    TWC has fully authorized the person executing this Release to do so on its behalf.

1.13    TWC warrants that the Release constitutes a legal, valid and binding release enforceable against it in accordance with its terms.

1.14    TWC, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, warrants that it does not hold Second Mortgage Notes, directly or indirectly, and that it will not acquire Second Mortgage Notes, directly or indirectly, after the Effective date of the Title Companies/Lender Settlement Agreement. To the extent that TWC holds Second Mortgage Notes, directly or indirectly, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, TWC covenants, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, that it will not sue or seek a recovery from the Title Company Parties as a holder of Second Mortgage Notes.

TRLP
1.15    The Recitals set forth above are true and correct and are fully incorporated herein.

1.16    TRLP has obtained all consents and approvals and has taken all corporate or charter action necessary to authorize the execution and delivery of this Release.

1.17    TRLP has fully authorized the person executing this Release to do so on its behalf.

1.18    TRLP warrants that the Release constitutes a legal, valid and binding release enforceable against it in accordance with its terms.

1.19    TRLP, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, warrants that it does not hold Second Mortgage Notes, directly or indirectly, and that it will not acquire Second Mortgage Notes, directly or indirectly, after the Effective date of

FNTI\48138\913752.1
EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

the Title Companies/Lender Settlement Agreement. To the extent that TRLP holds Second Mortgage Notes, directly or indirectly, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, TRLP covenants, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, that it will not sue or seek a recovery from the Title Company Parties as a holder of Second Mortgage Notes.

### Jeff

1.20    The Recitals set forth above are true and correct and are fully incorporated herein.

1.21    Jeff warrants that the Release constitutes a legal, valid and binding release enforceable against him in accordance with its terms.

1.22    Jeff, on behalf of himself and on behalf of his respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, warrants that he does not hold Second Mortgage Notes, directly or indirectly, and that he will not acquire Second Mortgage Notes, directly or indirectly, after the Effective date of the Title Companies/Lender Settlement Agreement. To the extent that Jeff holds Second Mortgage Notes, directly or indirectly, on behalf of himself and on behalf of his respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, he covenants, on behalf of himself and on behalf of his respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, that he will not sue or seek a recovery from the Title Company Parties as a holder of Second Mortgage Notes.

### Jackie

1.23    The Recitals set forth above are true and correct and are fully incorporated herein.

1.24    Jackie warrants that the Release constitutes a legal, valid and binding release enforceable against her in accordance with its terms.

1.25    Jackie, on behalf of herself and on behalf of her respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, warrants that she does not hold Second Mortgage Notes, directly or indirectly, and that she will not acquire Second Mortgage Notes, directly or indirectly, after the Effective date of the Title Companies/Lender Settlement Agreement. To the extent that Jackie holds Second Mortgage Notes, directly or indirectly, on behalf of herself and on behalf of her respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, she covenants, on behalf of herself and on behalf of her respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, that she will not sue or seek a recovery from the Title Company Parties as a holder of Second Mortgage Notes.

### Turnberry

1.26    The Recitals set forth above are true and correct and are fully incorporated herein.

1.27    Turnberry has obtained all consents and approvals and has taken all corporate or charter action necessary to authorize the execution and delivery of this Release.

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

1.28    Turnberry has fully authorized the person executing this Release to do so on its behalf.

1.29    Turnberry warrants that the Release constitutes a legal, valid and binding release enforceable against it in accordance with its terms.

1.30    Turnberry, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, warrants that it does not hold Second Mortgage Notes, directly or indirectly, and that it will not acquire Second Mortgage Notes, directly or indirectly, after the Effective date of the Title Companies/Lender Settlement Agreement.  To the extent that Turnberry holds Second Mortgage Notes, directly or indirectly, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, Turnberry covenants, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, that it will not sue or seek a recovery from the Title Company Parties as a holder of Second Mortgage Notes.

2.      ACKNOWLEDGEMENTS AND CONSENTS:

Title Companies:

Each of the undersigned Title Companies expressly acknowledges that:

2.1    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.2    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.3    With respect to this Release, FBR, TWC, TRLP, Turnberry, Jeff and Jackie have not made any statement or representation to the Title Companies regarding any fact which statement or representation the Title Companies have relied upon.

2.4    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.5    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

FBR:

FBR expressly acknowledges that:

2.6    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.7    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.8    With respect to this Release, the Title Companies have not made any statement or representation to FBR regarding any fact which statement or representation FBR has relied upon.

2.9    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

2.10    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

TWC:

TWC expressly acknowledges that:

2.11    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.12    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.13    With respect to this Release, the Title Companies have not made any statement or representation to TWC regarding any fact which statement or representation TWC has relied upon.

2.14    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.15    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

TRLP:

TRLP expressly acknowledges that:

2.16    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.17    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.18    With respect to this Release, the Title Companies have not made any statement or representation to TRLP regarding any fact which statement or representation TRLP has relied upon.

2.19    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.20    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

Jeff:

Jeff expressly acknowledges that:

2.21    He has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.22    He has received independent legal advice from attorneys of his choice with respect to the advisability of providing this Release.

2.23    With respect to this Release, the Title Companies have not made any statement or representation to Jeff regarding any fact which statement or representation Jeff has relied upon.

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

2.24    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.25    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

Jackie:

Jackie expressly acknowledges that:

2.26    She has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.27    She has received independent legal advice from attorneys of her choice with respect to the advisability of providing this Release.

2.28    With respect to this Release, the Title Companies have not made any statement or representation to Jackie regarding any fact which statement or representation Jackie has relied upon.

2.29    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.30    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

Turnberry:

Turnberry expressly acknowledges that:

2.31    It has carefully read this Release, understands the contents of this Release, signs this Release as a free and voluntary act, and consents to the terms of the Release in all respects.

2.32    It has received independent legal advice from attorneys of its choice with respect to the advisability of providing this Release.

2.33    With respect to this Release, the Title Companies have not made any statement or representation to Turnberry regarding any fact which statement or representation Turnberry has relied upon.

2.34    The terms of this Release are contractual and are the result of arm's-length negotiations among the Parties.

2.35    Each of the Parties cooperated in the drafting of this Release such that any construction of the Release shall not be made based on any rule providing for interpretation against the party who causes uncertainty to exist or against the author.

3.      DISMISSAL WITH PREJUDICE OF THE INDEMNITY CASE:  The Indemnity Case Plaintiffs and Indemnity Case Defendants shall execute and deliver a stipulation of dismissal with prejudice of the Indemnity Case in its entirety, with each party to bear its own fees and cost by the Execution Deadline Date.  Timely delivery of the stipulation to counsel for the Title Companies, which shall be held in escrow by such counsel until the Effective Date of the Title Companies/Lender Settlement Agreement, is a condition precedent to the occurrence of such Effective Date.  Within five (5) business days after such Effective Date, the Indemnity Case

Plaintiffs shall move for the entry of an order dismissing the Indemnity Case with prejudice in accordance with the stipulation.

4.   DISMISSAL WITH PREJUDICE OF THE NEGLIGENCE CASE:  The Negligence Case Plaintiffs and Jeff shall execute and deliver a stipulation of dismissal with prejudice of the Negligence Case in its entirety, with each party to bear its own fees and costs, by the Execution Deadline Date.  Timely delivery of the stipulation to counsel for the Title Companies, which shall be held in escrow by such counsel until the Effective Date of the Title Companies/Lender Settlement Agreement, is a condition precedent to the occurrence of such Effective Date.  Within five (5) business days after such Effective Date, the Negligence Case Plaintiffs shall move for the entry of an order dismissing the Indemnity Case with prejudice in accordance with the stipulation.

5.   DISMISSAL WITHOUT PREJUDICE OF THE RETAIL CASE:  The parties to the Retail Case shall execute a tolling agreement so the Title Companies preserve the Title Companies Retail Indemnity Claims (and correspondingly FBR preserves its denials and affirmative defenses in respect thereto), and deliver a stipulation of dismissal without prejudice of the Retail Case.  Each of the Parties to the Retail Case shall bear their own fees and costs related to the Retail Case through the date of the dismissal without prejudice of the Retail Case.  FBR, TWC, TRLP, Turnberry, Jeff and Jackie shall execute and deliver to the Title Companies, and the Title Companies shall execute and deliver to FBR, TWC, TRLP, Turnberry, Jeff and Jackie, by the Execution Deadline Date copies of this B-5 Release, the tolling agreement, and the stipulation of dismissal without prejudice of the Retail Case.  Timely delivery of the forgoing, which shall be held in escrow by counsel for the Parties to the Retail Case until the Effective Date of the Title Companies/Lender Settlement Agreement, is a condition precedent to the Effective Date.  Within five (5) business days after such Effective Date, the Title Companies shall file the stipulation of dismissal without prejudice in the Retail Case.

6.   RELEASE BY FBR:  Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, FBR, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters and the Indemnity Case, hereby fully and forever waives, relinquishes, releases and discharges the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case, provided, however, the foregoing is not deemed a release of the Title Companies in connection with the Retail Case and/or Title Companies Retail Indemnity Claims.  FBR stipulates and agrees that this Section 6 release shall be broadly interpreted to constitute a complete release in favor of the Title

FNTI\48138\913752.1

9

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

Company Parties of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case. This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, FBR expressly contracts to release the Title Companies from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Las Vegas Matters, Indemnity Agreement, Indemnity Case, and the Negligence Case.

7.    RELEASE BY TWC: Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, TWC, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters and the Indemnity Case, hereby fully and forever waives, relinquishes, releases and discharges the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case; provided, however, the foregoing shall not be deemed a release of the Title Companies in connection with the Retail Case and/or Title Companies Retail Indemnities Claims. TWC stipulates and agrees that this Section 7 release shall be broadly interpreted to constitute a complete release in favor of the Title Company Parties of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case. This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, TWC expressly contracts to release the Title Companies from future and unknown claims, causes of action and/or demands with respect

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

to the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case.

8.    <u>RELEASE BY TRLP</u>:  Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, TRLP, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters and the Indemnity Case, hereby fully and forever waives, relinquishes, releases and discharges the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case; provided, however, the foregoing shall not be deemed a release of the Title Companies in connection with the Retail Case and/or Title Companies Retail Indemnity Claims.  TRLP stipulates and agrees that this Section 8 release shall be broadly interpreted to constitute a complete release in favor of the Title Company Parties of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case.  This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties.  (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)).Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, TRLP expressly contracts to release the Title Companies from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Las Vegas Matters, Indemnity Agreement, Indemnity Case, and the Negligence Case.

9.    <u>RELEASE BY JEFF</u>:  Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, Jeff, on behalf of himself and on behalf of his respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters, the Negligence Case and the Indemnity Case, hereby fully and forever waives, relinquishes, releases and discharges the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or

unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case and the Negligence Case; provided, however, the foregoing shall not be deemed a release of the Title Companies in connection with the Retail Case and/or Title Companies Retail Indemnity Claims. Jeff stipulates and agrees that this Section 9 release shall be broadly interpreted to constitute a complete release in favor of the Title Company Parties of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case and the Negligence Case. This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, Jeff expressly contracts to release the Title Companies from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case and the Negligence Case.

10.    RELEASE BY JACKIE: Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, Jackie, on behalf of herself and on behalf of her respective former, present and future parents, affiliates, subsidiaries and successors, and assigns, representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters and the Indemnity Case, hereby fully and forever waives, relinquishes, releases and discharges the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case; provided, however, the foregoing shall not be deemed a release of the Title Companies in connection with the Retail Case and/or Title Companies Retail Indemnity Claims. Jackie stipulates and agrees that this Section 10 release shall be broadly interpreted to constitute a complete release in favor of the Title Company Parties of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case. This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)).    Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, Jackie expressly contracts to release the Title Companies from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case.

   11. <u>RELEASE BY TURNBERRY</u>: Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, Turnberry, on behalf of itself and on behalf of its respective former, present and future parent, affiliated, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters and the Indemnity Case, hereby fully and forever waives, relinquishes, releases and discharges the Title Company Parties of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case; <u>provided, however,</u> the foregoing shall not be deemed a release of the Title Companies in connection with the Retail Case and/or Title Companies Retail Indemnity Claims.  Turnberry stipulates and agrees that this Section 11 release shall be broadly interpreted to constitute a complete release in favor of the Title Company Parties of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a Release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case.  This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)).    Except for the Title Companies' obligations under the Title Companies/Lender Settlement Agreement, the Comprehensive Settlement Agreement and this Release, Turnberry expressly contracts to release the Title Companies from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case.

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
<u>EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT</u>

12.    RELEASE BY THE TITLE COMPANIES: Except for the obligations of the Parties other than the Title Companies under the Comprehensive Settlement Agreement, the Title Companies Retail Indemnity Claims and this Release, the Title Companies, on behalf of themselves and each of their parent, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters (including the Fontainebleau Project), the Indemnity Case and the Negligence Case, hereby fully and forever waive, relinquish, release and discharge FBR, TWC, TRLP, Jeff, Turnberry, and Jackie (and including the defendants in the Indemnity Case and Negligence Case), and all of their respective current and former owners, employees, subsidiaries, assigns, successors, agents and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters (including the Fontainebleau Project), the Indemnity Case and the Negligence Case, of and from, without limitation, any and all claims, demands, controversies, damages, actions, causes of action, debts, liabilities, rights, contracts, costs (including attorneys' fees, costs and any other expense), indemnities, contributions, obligations, and losses of every kind or nature whatsoever, whether at this time known or unknown, anticipated or unanticipated, direct or indirect, fixed or contingent, which may presently exist or may hereafter arise or become known, for or by reason of any act, omission, event, transaction, matter or cause whatsoever from the beginning of time through date of this Release, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case and the Negligence Case. In furtherance of the foregoing, and without limiting the generality thereof, the Title Companies expressly hereby irrevocably waive and release any and all claims and interests in any recovery from any director and/or officer liability policies involving one or more of the officers and/or directors of FBR, the Retail Debtors and/or the Resort Debtors, and all of their respective current and former owners, employees, subsidiaries, assigns, successors, agents and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters (including the Fontainebleau Project), the Indemnity Case and the Negligence Case. The Title Companies stipulate and agree that this Section 12 release shall be broadly interpreted to constitute a complete release in favor of FBR, Turnberry, TWC, TRLP, Jeff and Jackie, and all of their respective current and former owners, employees, subsidiaries, assigns, successors, agents and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters (including the Fontainebleau Project), the Indemnity Case and the Negligence Case, of all existing or potential claims, whether known or unknown, discoverable or not and shall constitute a release of all future claims, demands and actions, presently unknown, directly or indirectly related to, arising from, or which could be inferred or implied by or included in connection with the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case, and the Negligence Case. This Release is drafted to be consistent with applicable case law in Nevada which holds that a release does not apply to future causes of action or claims unless expressly contracted to do so by the parties. (*In Re Amerco Derivative Litigation* (2011) 252 P. 3d 681, 693 (Nev. 2011); *Clark v. Columbia/HCA Info. Servs.* (2001) 117 Nev. 468, 480, 25 P.3d 215, 223-24 (2001)). Except for the Title Companies' obligations under the Comprehensive Settlement Agreement, the Title Companies Retail Indemnity Claims and this Release, the Title Companies expressly contract to release FBR, Turnberry, TWC, TRLP, Jeff and Jackie, and all of their respective current and former owners, employees, subsidiaries, assigns, successors, agents and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters (including the Fontainebleau Project), the

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

Indemnity Case and the Negligence Case, from future and unknown claims, causes of action and/or demands with respect to the Fontainebleau Las Vegas Matters (including the Fontainebleau Project), Indemnity Agreement, Indemnity Case and the Negligence Case.

This Release shall be binding upon and inure to the benefit of the Parties and their successors and assigns, including any reorganized entity or any trustee or fiduciary that may be appointed or elected pursuant to the Bankruptcy Code or other applicable law. This Release shall remain in full force and effect notwithstanding the entry of any subsequent order, judgment, or decree by any court, arbitration panel or other tribunal, avoiding or nullifying any transfers or transactions with respect to any of the Parties or their successors or assigns.   This Release shall be immediately effective subject to and upon the Effective Date of the Title Companies/Lender Settlement Agreement.

13.     GOVERNING LAW: This Release shall be construed in accordance with, and governed in all respects by, the laws of the State of Nevada.

14.     FURTHER DISPUTE RESOLUTION:   Any litigation arising out of, under, or in connection with this Release shall be brought and maintained exclusively in the Bankruptcy Court. The Parties irrevocably and unconditionally submit, for themselves and their property, to the exclusive jurisdiction of the Bankruptcy Court, and expressly waive the right to any other jurisdiction to which they may be entitled by reason of their present or future domicile or otherwise.

15.     SUCCESSORS AND ASSIGNS. This Release shall be binding upon all successors and assigns of the Parties.

16.     NO SUIT. The Parties covenant and agree not to bring any action, claim, suit or proceeding based on any matter released hereunder.

17.     EFFECTIVENESS. For avoidance of doubt, this Release shall be null, void and without effect if the Effective Date of the Title Companies/Lender Settlement Agreement does not occur.

SO AGREED:

Date: October ___, 2013

FONTAINEBLEAU RESORTS, LLC:

By:     _____
Name:     _____
Title:     _____

Date: October ___, 2013

TURNBERRY, LTD.:

By:     _____
Name:     _____

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

Title: _____

Date: October ___, 2013          TURNBERRY WEST CONSTRUCTION, INC.:

By: _____
Name: _____
Title: _____

Date: October ___, 2013          TURNBERRY RESIDENTIAL LIMITED
PARTNER, L.P.:

By: _____
Name: _____
Title: _____

Date: October ___, 2013          JEFFREY SOFFER:

_____

Date: October ___, 2013          JACQUELYN SOFFER:

_____

SO AGREED:

FIDELITY NATIONAL TITLE INSURANCE COMPANY          Date: October ___, 2013
By: _____
Its: _____

FIDELITY NATIONAL TITLE INSURANCE COMPANY AS
SUCCESSOR BY MERGER FOR LAWYERS TITLE
INSURANCE CORPORATION          Date: October ___, 2013
By: _____
Its: _____

COMMONWEALTH LAND TITLE INSURANCE COMPANY   Date: October ___, 2013
By: _____
Its: _____

COMMONWEALTH LAND TITLE INSURANCE COMPANY AS
SUCCESSOR BY MERGER TO TRANSNATION TITLE
INSURANCE COMPANY          Date: October ___, 2013

FNTI\48138\913752.1

16

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

By: _____
Its:_____

ALAMO TITLE INSURANCE                          Date: October ___, 2013
By: _____
Its:_____

CHICAGO TITLE AND TRUST COMPANY                Date: October ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY                Date: October ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY AS SUCCESSOR
BY MERGER TO TICOR TITLE INSURANCE COMPANY     Date: October ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY AS SUCCESSOR
BY MERGER TO TICOR TITLE INSURANCE
 COMPANY OF FLORIDA                            Date: October ___, 2013
By: _____
Its:_____

CHICAGO TITLE INSURANCE COMPANY AS SUCCESSOR BY
MERGER TO SECURITY UNION TITLE INSURANCE COMPANY
By: _____                      Date: October ___, 2013
Its:_____

FIRST AMERICAN TITLE INSURANCE COMPANY         Date: October ___, 2013
By: _____
Its:_____

EXHIBIT B-7 TO COMPREHENSIVE SETTLEMENT AGREEMENT
EXHIBIT B-5 TO TITLE COMPANIES/TERM LENDER SETTLEMENT

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re                                          )      Case No. 09-21481-BKC-AJC
                                               )      Chapter 7
                                               )      Jointly Administered
FONTAINEBLEAU LAS VEGAS                        )
HOLDINGS, LLC, et al.,                         )
                                               )
            Debtors.                           )
_____)

## ORDER GRANTING JOINT MOTION TO APPROVE COMPREHENSIVE SETTLEMENT AGREEMENT REGARDING DISTRIBUTION OF ICAHN SALE PROCEEDS AND RESOLUTION OF RELATED DISPUTES AND PROCEEDINGS

This matter came before the Court for hearing on November 13, 2013 at 10:00 a.m.

upon the joint motion of the Trustee,[1] Wilmington, the Term Lenders, the Statutory

Lienholders, the Turnberry Parties and the Title Companies (ECF No. _____)(the "Joint

Motion") for approval of the "Comprehensive Settlement Agreement Regarding Distribution

of Icahn Sale Proceeds and Resolution of Related Disputes and Proceedings" (along with the

exhibits thereto, the "Comprehensive Settlement Agreement"), attached to the Joint Motion

as Exhibit A. Having reviewed the record, including the Joint Motion, the Comprehensive

---

[1] All capitalized terms not defined in this Order shall have the same meaning ascribed to them in the Motion or, if not defined therein, in the Comprehensive Settlement Agreement or exhibits thereto, unless otherwise provided for herein.

Settlement Agreement, the objections to the Motion, including the objections filed by

_____ (collectively, the "Objections"), the prior findings and rulings of this Court, and

heard, reviewed and considered the evidence and arguments offered at the November 13,

2013 hearing on the Joint Motion, and after due deliberation and good cause appearing:

IT IS HEREBY FOUND AND DETERMINED THAT:

      A.     This Court has jurisdiction to hear and determine the Joint Motion pursuant to

28 U.S.C. §§157 and 1334.

      B.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

      C.     Determination of the Joint Motion is a core proceeding under 28 U.S.C.

§ 157(b)(2). The statutory predicates for the relief requested in the Joint Motion are sections

105 and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.

      D.     Proper, timely, adequate, and sufficient notice of the Joint Motion, and of the

proposed relief described therein, including the Bar Orders (as defined below) contained in

this Order, was given by the Movants and such notice was reasonable and appropriate under

the circumstances and comports in all regards with the requirements of due process, section

102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and the Case

Management Order [ECF No. 276].

      E.     A reasonable opportunity to object or be heard regarding the relief requested in

the Joint Motion has been afforded to all interested persons and entities.

      F.     The Trustee has full power and authority, on behalf of the Debtors, necessary

to enter into the Comprehensive Settlement Agreement and all other documents

contemplated thereby. The transactions provided for in the Comprehensive Settlement

Agreement have been duly authorized by all necessary or proper action, and no consents or

2

approvals, other than those expressly provided for in the Comprehensive Settlement Agreement or this Order by the Bankruptcy Court (the "Order" or "Settlement Order"), are required for the consummation of the transactions under the Comprehensive Settlement Agreement.

G.    Wilmington has full power and authority, on behalf of all of the Lenders under the Credit Agreement, necessary to enter into the Comprehensive Settlement Agreement and the Title Companies/Lender Settlement Agreement, and all other documents contemplated thereby, and, as of the Effective Date: 1) to release the Title Companies from all claims and obligations under the First Lien Title Policy; 2) to agree and acknowledge that any obligations, conditions and restrictions imposed upon the Title Companies under the First Lien Title Policy are terminated and cancelled as of the Effective Date.

H.    The Comprehensive Settlement Agreement is in the best interest of the Debtors' estates and reflects the Trustee's exercise of sound business judgment.    The allocation of proceeds among the Parties to the Comprehensive Settlement Agreement, including without limitation the allocation of proceeds between the Retail Debtors and Resort Debtors, is fair and reasonable in all respects, and made in good faith.    Because the claims of Wilmington secured by its lien on the Icahn Sale Proceeds exceed the total amount of Icahn Sale Proceeds, the holders of Second Lien Mortgage Notes are not entitled to receive any allocation or distribution of the Icahn Sale Proceeds.    Based on the record before this Court, the Parties to the Comprehensive Settlement Agreement have all met their respective burden to demonstrate that the Comprehensive Settlement Agreement falls within the range of reasonable outcomes for the Debtors and each of the Movants, avoids the further cost, delay and risk of collectability to all Parties associated with litigating disputes, providing

3

significant benefit to the Debtors' estate, serves the paramount interest of creditors and other parties in interest, and was negotiated at arms-length and in good faith among the Trustee, Wilmington, the Term Lenders, the Statutory Lienholders, the Turnberry Parties and the Title Companies. Accordingly, this Court finds and concludes that the Comprehensive Settlement Agreement satisfies the requirements set forth in *Wallis v. Justice Oaks II, Ltd.* (*In re Justice Oaks II, Ltd.*), 898 F.2d 1544, 1549 (11th Cir. 1990), 11 U.S.C. § 105, and Rule 9019 of the Federal Rules of Bankruptcy Procedure.

I.    Based on the record before this Court, the releases of claims and injunctions under the Completion Guaranty Bar Order, the Contractor Bar Order and the Title Companies Bar Order (together, the "Bar Orders") and the exculpation of Wilmington (the "Wilmington Exculpation") are given for fair consideration, are fair and equitable, and are appropriate in order to achieve the finality that is contemplated by the Comprehensive Settlement Agreement, and good cause therefore exists for inclusion of the Bar Orders and the Wilmington Exculpation in this Order. The Bar Orders are integral to the Comprehensive Settlement Agreement and were a material inducement to the agreement of the beneficiaries of the Bar Orders (the Turnberry Parties, the Term Lenders, Wilmington and the Title Companies) to enter into the Comprehensive Settlement Agreement, and but for the Bar Orders, those beneficiaries of the Bar Orders would not have entered into the Comprehensive Settlement Agreement. Accordingly, this Court finds and concludes that the Bar Orders each satisfy the requirements set forth in *Munford v. Munford, Inc.* (*In re Munford*), 97 F.3d 449 (11th Cir. 1996), *Apps v. Morrison* (*In re Superior Homes & Investments, LLC*), Case No. 12-15451 (11th Cir. June 10, 2013), and their progeny, and that this Court has the necessary jurisdiction to grant the Bar Orders.

4

17766118\V-3

J.      Based upon the evidence presented and the record in these cases, the Court hereby finds that the Movants are relying on this Order, including the findings of fact, conclusions of law, the releases and injunctions granted under the Comprehensive Settlement Agreement and hereunder, and the relief provided hereby and the continuing validity of the foregoing, in consummating the transactions contemplated by the Comprehensive Settlement Agreement.

K.      All objections, if any, to the approval of the Comprehensive Settlement Agreement, or to the transactions contemplated thereby, have been withdrawn, resolved or overruled.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED and all of the Objections, to the extent not otherwise resolved, are hereby overruled.

2.      The terms of the Comprehensive Settlement Agreement attached to the Joint Motion as Exhibit A are hereby authorized and approved in all respects; pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019. The failure to include any particular provisions of the Comprehensive Settlement Agreement in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the Comprehensive Settlement Agreement be approved in its entirety.

3.      The Trustee is hereby fully authorized and empowered to:  (a) make, enter into, execute and perform their obligations under the Comprehensive Settlement Agreement or any agreement, instrument or document contemplated by the Comprehensive Settlement Agreement, and (b) take such other further steps as are contemplated by the Comprehensive Settlement Agreement to fulfill his obligations thereunder or as may be necessary to

17766118\V-3

effectuate the terms of this Order, including, without limitation, to use the Icahn Sale Proceeds Balance to fund the distributions as authorized and directed under Paragraph 4 of this Order.

4.      On the Effective Date of the Comprehensive Settlement Agreement, and subject in all respects to the terms and conditions of the Comprehensive Settlement Agreement and the Title Companies/Lender Settlement Agreement: a) Wilmington shall distribute to the Trustee, from the Completion Guaranty Proceeds Account, an indefeasible cash payment in the amount of $49,956,430.27, which funds shall be used by the Trustee solely to pay: (i) Applicable Project Costs (as defined in the Completion Guaranty), which constitutes distributions to the Statutory Lienholders as provided herein; and (ii) Jeffrey Soffer, as provided herein; (b) the Title Companies shall distribute to the Trustee, an indefeasible cash payment in the amount of $33,350,000.00; (c) the Trustee shall distribute an indefeasible cash payment to Jeff Soffer in the amount of $1,000,000.00; (d) the Trustee shall distribute to the Statutory Lienholders, at the times and in the manner prescribed by the terms of the Comprehensive Settlement Agreement, an indefeasible cash payment in the amount of $85,389,233.75; (e) the Trustee shall distribute to Wilmington an indefeasible cash payment of $88,956,430.27; and (f) the Trustee shall distribute, to the Retail Debtors, and further, in his capacity as Trustee for the Retail Debtors, distribute solely to the Retail Lenders, an indefeasible cash payment in the amount of $1,000,000.00. The distributions to be made under this Paragraph 4 shall be free and clear of any lien, claim or interest and shall not be subject to any offset or surcharge. The Trustee is authorized and directed to make the above disbursements under this Paragraph 4 by wire transfer. Following the Effective Date, the Trustee shall retain, as funds of the Bankruptcy Estates, the remaining $350,000 in

6

17766118\V-3

Available Disbursement Funds, to be applied, as provided in Section 7.02 of the Comprehensive Settlement Agreement, toward compensation awarded by the Bankruptcy Court to the Trustee on account of disbursement of $33,000,000 of the Gross Statutory Lienholder Proceeds received from the Title Companies pursuant to Section 2.01(c)(i) of the Comprehensive Settlement Agreement.

     5.     **Contractor Bar Order.**  As of the Effective Date, each of the Statutory Lienholders and all other parties who have, or may have, mechanic's lien rights in the Fontainebleau Las Vegas Project, and each of their successors and assigns, are permanently enjoined, barred and restrained from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, claim or other proceeding of any kind, whether known or unknown (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any of the Turnberry Parties,[2] the Term Lenders, Wilmington, the Title Companies, the Trustee, along with the court-appointed examiner (the "Examiner") and any professionals engaged by the Settlement Parties, the Examiner, the Debtors or the Official Committee of Unsecured Creditors (collectively, the "Professionals"), based upon, arising out of, in connection with, or related to the Project; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against any of the Turnberry Parties, the Term Lenders, Wilmington, the Title Companies, the Trustee, the Examiner and the Professionals based upon, arising out of, in connection with, or related to the Fontainebleau Las Vegas Project;

---

[2] For purposes of Paragraphs 5 and 6 of this Order, the term "Turnberry Parties" shall be expanded to mean, in addition to each Turnberry Party, each of their respective former and current directors officers, owners, members, affiliates, employees, related parties and subsidiaries, provided that the term "Turnberry Parties" shall exclude any Retail Debtors or Resort Debtors.

17766118\V-3

and (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any claims (whether known or unknown) or encumbrance of any kind against any of the Turnberry Parties, the Term Lenders, Wilmington, the Title Companies, the Trustee, the Examiner and the Professionals based upon, arising out of, in connection with, or related to the Fontainebleau Las Vegas Project. This Contractor Bar Order shall not be deemed: (i) a release of any claim of the Statutory Lienholders against the Net Statutory Lienholder Proceeds (as defined in the Comprehensive Settlement Agreement); (ii) to bar any Statutory Lienholder from commencing the Lien Action as set forth in Article VI of the Comprehensive Settlement Agreement; (iii) to impair the perfection or validity of any properly perfected and otherwise valid lien claim; or (iv) prohibit naming Turnberry West Construction, Inc. as a nominal defendant in the Lien Action to the extent legally required, subject to Section 6.03(d) of the Comprehensive Settlement Agreement.

6.    **Completion Guaranty Bar Order**.  As of the Effective Date, Wilmington and each of the Beneficiaries under the Completion Guaranty (including Wilmington, the Lenders under the Credit Agreement, the indenture trustee under the Second Mortgage Notes Indenture, and the holders of Second Mortgage Notes), and each of their successors and assigns, are permanently enjoined from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, claim or other proceeding of any kind, whether known or unknown (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Turnberry Parties arising under or based upon the Completion Guaranty or the Completion Guaranty Judgment; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly,

8

any judgment, award, decree or order against the Turnberry Parties arising under or based upon the Completion Guaranty or the Completion Guaranty Judgment; and (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any claims (whether known or unknown) or encumbrance of any kind against the Turnberry Parties arising under or based upon the Completion Guaranty or the Completion Guaranty Judgment.

7.    **Title Companies Bar Order**.  As of the Effective Date, Wilmington and the Lenders under the Credit Agreement (as identified on Exhibit A-1 and Exhibit A-2 to the Title Companies/Lender Settlement Agreement), and each of their successors and assigns, are permanently enjoined from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, claim or other proceeding of any kind, whether known or unknown (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Title Company Parties that is subject to the release in favor of the Title Companies under Exhibit B-2 of the Title Companies/Lender Settlement Agreement; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Title Company Parties arising under or based upon a claim that is the subject of the release in favor of the Title Companies under Exhibit B-2 of the Title Companies/Lender Settlement Agreement; and (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any claims (whether known or unknown) or encumbrance of any kind against the Title Company Parties arising under or based upon a claim that is otherwise subject to release under Exhibit B-2 of the Title Companies/Lender Settlement Agreement. The Title Companies/Lender Settlement Agreement and the findings contained in Paragraph

9

17766118\V-3

G of this Order shall be binding on Wilmington and each of the Lenders under the Credit Agreement. In addition, any Lender under the Credit Agreement who receives and accepts a pro rata share of the funds indefeasibly distributed by the Trustee to Wilmington under the Settlement Agreement as authorized hereunder shall, in consideration of the receipt of such funds, be deemed to release any and all claims against the Title Company Parties otherwise subject to release under Exhibit B-2 of the Title Companies/Lender Settlement Agreement.

8.    **Exculpation of Wilmington**.    Any and all claims of the Lenders under the Credit Agreement and the Beneficiaries under the Completion Guaranty against Wilmington or its employees and professionals arising from or in connection with (i) entering into the Comprehensive Settlement Agreement, the Title Companies/Lender Settlement Agreement, and all agreements and documents relating thereto, or (ii) its acting as Administrative Agent under the Credit Agreement and all agreements and documents thereto, and as Disbursement Agent under the Master Disbursement Agreement and all agreements and documents relating thereto, or its performance of its duties thereunder on or prior to the Effective Date of the Comprehensive Settlement Agreement shall be deemed fully waived, barred, released and discharged in all respects, except as to those rights, obligations, duties, claims and responsibilities expressly preserved, created or established by the terms of the Comprehensive Settlement Agreement and the Title Companies/Lender Settlement. For the avoidance of doubt, nothing in this Paragraph 8 shall be construed as releasing or affecting in any way any claims against Bank of America, N.A., including claims against Bank of America, N.A. arising from or related to the performance of its duties as Administrative Agent under the Credit Agreement and as Disbursement Agent under the Master Disbursement Agreement.

10

17766118\V-3

9.      The "Additional Provisions Related to Statutory Lienholders" set forth in Article VI of the Comprehensive Settlement Agreement are approved in all respects.

10.     Except to the extent expressly provided in this Order or the Comprehensive Settlement Agreement, nothing in this Order or the Comprehensive Settlement Agreement will be deemed to be or construed as a release or waiver of any other claims held by any party.

11.     Nothing in this Order or the Comprehensive Settlement Agreement will be deemed to reopen the bar date previously established in these chapter 7 proceedings.

12.     The Comprehensive Settlement Agreement and all transactions contemplated thereby, including this Order, shall be binding upon and inure to the benefit of the Debtors, the Parties hereto, and their respective successors and assigns.  In addition, this Order, including the findings of fact and conclusions of law provided hereunder, shall be binding on all creditors and parties-in-interest of the Debtors.

13.     This Court hereafter shall and does retain exclusive jurisdiction: (a) to interpret, construe, enforce and implement the terms and provisions of the Comprehensive Settlement Agreement and this Order, all amendments thereto, any waivers and consents thereunder, any agreements executed in connection therewith, and any and all disputes that may arise under the Comprehensive Settlement Agreement or this Order as between the parties; (b) to hear and determine any and all disputes between the Parties, as the case may be, and any third parties relating to the Comprehensive Settlement Agreement; (c) compel delivery and payment of the consideration and distributions provided for under the Comprehensive Settlement Agreement; (d) resolve any disputes, controversies or Claims arising out of or relating to the Comprehensive Settlement Agreement; (e) interpret,

11

implement, and enforce the provisions of this Order; provided, however, that in the event that this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause, or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter. If there is a conflict regarding the Court's jurisdiction under this Order and the Comprehensive Settlement Agreement or exhibits thereto, the terms of this Paragraph 13 shall govern.

14.    If an order dismissing any of these Bankruptcy Cases is at any time entered, the terms of the Comprehensive Settlement Agreement and this Order shall continue in full force and effect and this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the terms of the Comprehensive Settlement Agreement and this Order.

15.    This Order shall be effective immediately upon its entry.  Based upon good cause shown, the stay of this Order provided by any Bankruptcy Rule, whether for fourteen days or otherwise, is hereby waived, and this Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

###

17766118\V-3

**Submitted by:**

Russell M. Blain
Stichter Riedel Blain & Prosser, P.A.
110 E. Madison Street, Suite 200
Tampa, Florida 33602
(813) 229-0144
(813) 229-1811 (facsimile)
rblain@srbp.com

**Copies furnished to:**

Russell M. Blain, who will serve a copy of this order on all interested parties and file a certificate of service.

17766118\V-3

# EXHIBIT D

Exhibit D

| Manager / Investment Advisor | Term Lenders / Funds |
|---|---|
| Brigade Capital Management LLC | Brigade Leveraged Capital Structures Fund, Ltd. |
| | Battalion CLO 2007-1 Ltd. |
| Canyon Capital Advisors, LLC | Canpartners Investments IV, LLC |
| Caspian Capital LP | Caspian Capital Partners, LP |
| | Caspian Select Credit Master Fund, Ltd. |
| | Mariner LDC |
| | Caspian Alpha Long Credit Fund, L.P. |
| | Caspian SC Holdings LP |
| | Caspian Solitude Master Fund, L.P. |
| ING | ING Prime Rate Trust |
| | ING Senior Income Fund |
| | ING International (II) - Senior Bank Loans Euro |
| | ING Investment Management CLO I, Ltd. |
| | ING Investment Management CLO II, Ltd. |
| | ING Investment Management CLO III, Ltd |
| | ING Investment Management CLO IV, Ltd. |
| | ING Investment Management CLO V, Ltd. |
| | Phoenix CLO I, Ltd. |
| | Phoenix CLO II, Ltd. |
| | Phoenix CLO III, Ltd. |
| MJX Asset Management, LLC | Venture II CDO 2002, Limited |
| | Venture III CDO Limited |
| | Venture IV CDO Limited |
| | Venture V CDO Limited |
| | Venture VI CDO, Limited |
| | Venture VII CDO Limited |
| | Venture VIII CDO, Limited |
| | Venture IX CDO, Limited |
| | Vista Leveraged Income Fund |
| | Veer Cash Flow CLO, Limited |
| Monarch Alternative Capital LP | Monarch Master Funding Ltd. |
| Morgan Stanley | Morgan Stanley Senior Funding, Inc. |
| Silver Point Capital, L.P. | SPCP Group LLC |
| Solus Alternative Asset Management LP | Sola Ltd. |
| | Solus Core Opportunities Master Fund |
| | Solus Core Opportunities LP |
| | Solus Recovery Fund LP |
| | Solus Recovery Fund II Master LP |
| | Solus Recovery LH Fund LP |
| | Ultra Master, Ltd. |
| Venor Capital Management LP | Venor Capital Master Fund Ltd. |

# EXHIBIT E

### FONTAINEBLEAU LAS VEGAS SETTLEMENT AGREEMENT AMONG TITLE COMPANIES, TERM LENDER GROUP AND WILMINGTON

#### I.    Parties and Defined Terms

a.    "B of A Declaratory Judgment Action" means the action against Wilmington and certain Title Companies originally commenced in the United States District Court for the Southern District of New York, Case No. 12-CV-8730 (VM), and transferred to the Bankruptcy Court, Adversary Proceeding No. 13-01530-AJC.

b.    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida.

c.    "Bankruptcy Proceedings" means the bankruptcy cases of the Resort Affiliates and Retail Affiliates pending before the Bankruptcy Court that were converted to Chapter 7, and are being jointly administered, as described in Section II.b below.

d.    "Completion Guaranty Proceeds Account" means the funds in the amount of approximately $50 million held by Wilmington, in its capacity as disbursement agent, to secure the obligations of Turnberry Residential Limited Partner, L.P., under that certain completion guaranty dated June 6, 2007.

e.    "Comprehensive Settlement Agreement" means the Settlement Agreement dated October 4, 2013 among the Trustee, the Term Lender Group, Wilmington, the Statutory Lienholders, Turnberry Residential Limited Partner, L.P., Turnberry West Construction, Inc., Fontainebleau Resorts, LLC, Turnberry, Ltd. Jeffrey Soffer, Jacqueline Soffer, the Managers/Investment Advisors, and the Title Companies. .

f.    "Credit Agreement" means the June 6, 2007 Credit Agreement among Fontainebleau Las Vegas LLC, and Fontainebleau Las Vegas II, LLC, as borrowers, and Bank of America, N.A. ("B of A"), as Administrative Agent.

g.    "Effective Date" means the Effective Date of the Comprehensive Settlement Agreement, subject to the satisfaction of all conditions precedent contained in this Settlement Agreement and the Comprehensive Settlement Agreement, unless the Settlement Agreement is terminated in accordance with Sections VI and XIII.

h.    "Execution Deadline Date" means the first business day that is no fewer than thirty (30) calendar days after the Joint Motion Filing Date.

i.    "First Lien Title Policy" means the 2006 ALTA Loan Policy No. 08500442 (1st) (K56-0012592) issued by the Title Companies, insuring, *inter alia,* the first priority position of B of A's Deed of Trust recorded in the Official Records of Clark County on June 7, 2007 as Instrument No. 20070607-002525..

j.    "Fontainebleau Las Vegas Debtors" means the Resort Affiliates and the Retail Affiliates as defined in Section II.b below.

k.    "Fontainebleau Las Vegas Matters" means the First Lien Title Policy (as such term is defined herein), claims tendered under the First Lien Title Policy and/or which have been or could be asserted against the Title Companies relative to the Fontainebleau Project (as such term is defined herein), the Icahn Sale Proceeds, the Available Disbursement Funds (including the Icahn Sale Proceeds Balance and the Completion Guaranty Proceeds Account), statutory liens relative to the Fontainebleau Project, the Bankruptcy Proceedings (as such term is defined herein), the adversary proceedings filed in connection with Case No. 09-21481-BK-AJC, the senior loans advanced by the Insured Lenders, the Credit Agreement, Master Disbursement Agreement (as such term is defined in the Credit Agreement) and the Judge Altonaga Order and the related appeals; provided, however, that for avoidance of doubt, Fontainebleau Las Vegas Matters shall not include any claims, rights, defenses, causes of action and disputes arising under or related to the Retail Title Policy and the Second Lien Title Policy.

l.    "Fontainebleau Project" means the acquisition, development, construction, ownership and/or operation of the Fontainebleau Las Vegas Resort & Casino.

m.    "Icahn Sale Proceeds" means the net cash proceeds in the amount of approximately $100 million received by the Fontainebleau Las Vegas Debtors' estates from the sale of the Fontainebleau Project in February 2010.

n.    "Insured Lenders" means all current holders of loans or obligations (including holders of Term Loans, Revolving Loans, and Hedge obligations) under the Credit Agreement, whether or not such Insured Lenders are, claim to be, or may be deemed Insureds under the First Lien Title Policy, together with each of their successors and assigns. For avoidance of doubt, the Term Lender Group and B of A, in its capacity as a holder of revolving loans and hedge obligations, are Insured Lenders under this Settlement Agreement. A schedule is attached hereto as Exhibit "A-1" showing (i) the term lenders and revolving lenders as of _September 16, , 2013, including principal amounts outstanding as of such date, as reflected in the books and records maintained by Wilmington, and (ii) the principal amount of hedge obligations owing to each hedge counterparty as of such date as provided to Wilmington by such hedge counterparties.

o.    "Joint Motion Filing Date" means the date that the motion seeking approval of the Comprehensive Settlement Agreement is filed with the Bankruptcy Court.

p.    "Judge Altonaga Order" means the Order on remand entered on July 14, 2010 by the United States District Court for the Southern District of Florida, which is currently on appeal to the United States Court of Appeals for the Eleventh Circuit.

q.    "Represented Term Lenders" means the Term Lenders currently represented by Jones Day, Akerman Senterfitt, or McKool Smith Hennigan. A schedule of the Represented Term Lenders, including the principal amount of Term Loans held by each Represented Term Lender, is shown in Exhibit "A-2", attached hereto.

r.      "Retail Title Policy" means the 1992 ALTA Loan Policy No. 08500442 (Retail Leasehold) coinsured by Lawyer's Title Insurance Corp., Transnation Title Insurance Company and Commonwealth Land Title Insurance Co.

s.      "Second Lien Title Policy" means the 1992 ALTA Loan Policy No. 08500442 (2nd) (K56-0012592) issued by the Title Companies insuring, *inter alia*, Wells Fargo Bank's Deed of Trust recorded in the Official Records of Clark County on June 7, 2007 as Instrument No. 20070607-0002529 in second priority, junior and subordinate to B of A's Deed of Trust.

t.      "Settlement Agreement" means this Settlement Agreement.

u.      "Term Lender Group" means the Term Lenders (as defined in the Credit Agreement) represented by Jones Day and Akerman Senterfitt, who, together, constitute the Required Lenders under the Credit Agreement. A schedule of the Term Lender Group as of September 16, 2013, including the dollar amounts of Term Loans held by each member, is shown in Exhibit "A-2", attached hereto.

v.      "Title Companies" means Fidelity National Title Insurance Company; Fidelity National Title Insurance Company as successor by merger to Lawyers Title Insurance Corporation; Commonwealth Land Title Insurance Company; Commonwealth Land Title Insurance Company as successor by merger to Transnation Title Insurance Company; Alamo Title Insurance; Chicago Title and Trust Company; Chicago Title Insurance Company; Chicago Title Insurance Company as successor by merger to Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, and Security Union Title Insurance Company; and First American Title Insurance Company.

w.      "Title Company Parties" means the Title Companies and each of their parent, subsidiary and successor entities, and assigns, and representatives, and each of their professionals retained in connection with all Fontainebleau Las Vegas Matters.

x.      "Title Companies Pending Retail Litigation" means the following case pending in the Circuit Court of the Eleventh Judicial Circuit, Miami Dade County, Florida: *Lawyers Title Insurance Corporation, et al. v. Fontainebleau Resorts, LLC*, Case No. 10-14719-CA-40;

y.      "Title Companies Pending Soffer Litigation" means the following cases pending in the Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida: (i) *Fidelity National Title Insurance Company, et al. v. Fontainebleau Resorts, LLC, et al.*, Case No.: 09-75602-CA-40; and (iii) *Fidelity National Title Insurance Company, et al. v. Jeffrey Soffer*, Case No.: 10-20339-CA-40.

z.      "Title Companies Retail Indemnity Claims" shall have the meaning in Section III.c.

aa.     "Wilmington" means Wilmington Trust, N.A., successor to Wilmington Trust, FSB, named insured and Successor Administrative Agent under the Credit Agreement.

Any capitalized term not otherwise defined herein shall have the meaning used in the Credit Agreement or, if not defined therein, the Comprehensive Settlement Agreement.

.

## II.      Recitals

a.      On June 7, 2007, the Title Companies issued the First Lien Title Policy.  The "Name of Insured" in Schedule A of the First Lien Title Policy is "Bank of America, N.A., in its capacity as agent for the secured parties named in that certain Credit Agreement among Fontainebleau Las Vegas, LLC, a Nevada limited liability company, and Fontainebleau Las Vegas II, LLC, a Florida limited liability company, as borrowers, Bank of America, N.A., as the Administrative Agent and other secured parties dated June 6, 2007 and any successor agents." The First Lien Title Policy insured, among other matters, loss or damage resulting from the lack of priority of the insured Deed of Trust (executed by the Borrowers, as such term is defined in the Credit Agreement, as trustors, in favor of B of A, as beneficiary) as against statutory liens for services, labor or material arising from the construction of the Fontainebleau Las Vegas Resort & Casino, the real property encumbered by the insured deed of trust.

b.      On June 9, 2009 (the "Petition Date"), the Borrower and various affiliated entities (the "Resort Affiliates") filed Chapter 11 petitions in the United States Bankruptcy Court styled as *In re Fontainebleau Las Vegas Holdings, LLC et al.*, Case No. 09-21481-BKC-AJC (Bankr. S.D. Fla.).  On November 25, 2009, certain additional affiliates of the Borrower (the "Retail Affiliates") filed Chapter 11 petitions with the same Bankruptcy Court.  The bankruptcy cases of the Resort Affiliates and Retail Affiliates were thereafter converted to Chapter 7, and are being jointly administered (the "Bankruptcy Proceedings").

c.      Before and after the Petition Date, numerous contractors, subcontractors, material suppliers, and design professionals recorded statutory liens against the real property commonly known as the Fontainebleau Las Vegas Resort & Casino and filed proofs of claim in the Bankruptcy Proceedings.

d.      On July 22, 2009, B of A tendered a claim under the First Lien Title Policy to the Title Companies arising out of the statutory liens and an adversary proceeding filed by Turnberry West Construction, Inc. ("TWC"), the general contractor for the Fontainebleau Project, against B of A and former and existing secured lenders under the Credit Agreement.  TWC sought, *inter alia*, a declaration that it held a valid statutory lien, senior in priority to B of A's deed of trust (Case No. 09-01762-BKC-AJC).  Additional claims were also tendered to the Title Companies by former and existing holders of Term Loans under the Credit Agreement.  On September 10, 2009, the Title Companies notified B of A that its tender of defense was accepted subject to a complete reservation of rights and defenses under the First Lien Title Policy and that the Title Companies had retained counsel on behalf of B of A in connection with TWC's adversary proceeding and all of the statutory liens.

e.      Additional adversary proceedings were filed on October 14-15, 2009 by statutory lien claimants, styled as: *Desert Fire Protection, et al. v. Fontainebleau Las Vegas, LLC* (Case No. 09-02179-AJC), *Zetian Systems, Inc. et al. v. Fontainebleau Las Vegas, LLC* (Case No. 09-02187-AJC).  These adversary cases were also tendered by B of A to the Title Companies.

f.      On November 20, 2009, the Bankruptcy Court entered an Order Approving Wilmington as Successor Administrative Agent and Successor Disbursement Agent under the Credit Agreement and Master Disbursement Agreement [Doc. 1036].

g.      On December 2, 2009, Wilmington notified the Title Companies that Wilmington had been appointed the Successor Administrative Agent, replacing B of A, for the secured parties named in the Credit Agreement; that pursuant to the Successor Administrative Agent Agreement, B of A had assigned the First Lien Title Policy to Wilmington, and that Wilmington was "now the Insured under the Policy." Wilmington also provided a written notice of another lawsuit, *Zetian Systems, et al. v. Fontainebleau Las Vegas Retail*, filed on November 20, 2009 in the United States District Court, Clark County, Nevada (Case No. A-09-604049-C). On December 11, 2009, the Title Companies notified Wilmington that its tender of defense was accepted subject to a complete reservation of rights and defenses under the First Lien Title Policy.

h.      On December 2, 2009, Wilmington, by its counsel appointed by the Title Companies to represent Wilmington, as named insured, filed *Wilmington Trust, FSB v. A1 Concrete Cutting, et al.* (Case No. 09-02480-AJC) (the "Priority Litigation"), an adversary proceeding which named as defendants all statutory lienholders and other entities who asserted a lien claimed to be senior to the deed of trust assigned to Wilmington, as Successor Administrative Agent under the Credit Agreement.

i.      Wilmington and the Term Lender Group assert that the Title Companies are liable for any claims asserted under the First Lien Title Policy. The Title Companies deny liability for any and all of the claims asserted under the First Lien Title Policy.

NOW THEREFORE, in consideration of the promises and undertakings set forth herein, and upon the Effective Date hereof, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## III.      **Obligations of Title Companies**

a.      On the Effective Date, the Title Companies shall pay to the Trustee for distribution in accordance with the terms of the Comprehensive Settlement Agreement, the sum of $33,350,000.00 (the "Settlement Funds"). Such payment shall not be made unless the following conditions precedent have been satisfied, each of which is a condition precedent to the Effective Date: 1) the Title Companies have received, or waived in writing their right to receive pursuant to Section VI below, executed copies of releases from each of the Represented Term Lenders in the form attached as Exhibit B-2, from B of A in the form attached as Exhibit B-3, and from Wilmington in the form attached as Exhibit B-4; 2) all parties to the B of A Declaratory Judgment Action shall have executed and delivered to the Title Companies a stipulation of dismissal with prejudice of the B of A Declaratory Judgment Action, with each party to bear its own fees and costs (provided that the fees and costs of Wilmington are subject to reimbursement in accordance with the Credit Agreement), which stipulation shall be held in escrow by counsel for the Title Companies through the Effective Date; 3) Wilmington and the Term Lender Group have provided the certifications required in Section IV.g and IV.h, provided, the obligation to pay the Settlement Funds shall be further conditioned upon and subject to the absence of any breach by Wilmington or the Term Lender Group of any of their representations, warranties,

covenants or obligations under this Settlement Agreement and the Comprehensive Settlement Agreement; 4) by the Execution Deadline Date, the Title Companies shall have received executed copies of releases in the form attached as Exhibit B-5 and executed stipulations for dismissal of the Titles Companies Pending Soffer Litigation with prejudice (with all parties to bear their own attorneys' fees and costs) from Turnberry, Ltd. and all parties named as defendants in the Title Companies Pending Soffer Litigation and, in accordance with Section III.c. below, an executed stipulation of dismissal without prejudice and a tolling agreement executed by Fontainebleau Resorts, LLC ("FBR") concerning the Title Companies Pending Retail Litigation; and 5) all conditions to the Effective Date of the Comprehensive Settlement Agreement have been fully satisfied.

b.    On or before the Execution Deadline Date, and conditioned upon full satisfaction of the obligations of Wilmington, the Term Lender Group, and B of A as set forth in Sections IV and V below and elsewhere under this Settlement Agreement, the Title Companies shall execute and deliver copies of this Settlement Agreement to counsel for the Term Lender Group and Wilmington, and copies of the binding releases in the form attached as Exhibit B-1 to the parties who have executed a release in the forms attached as Exhibit B-2, Exhibit B-3, or Exhibit B-4. The releases to be executed by the Title Companies shall exclude the Title Companies Subrogation Claim, the Title Companies Retail Indemnity Claims discussed below, the Retail Title Policy, the Second Lien Title Policy and all defenses of the Title Companies thereunder, and the Title Companies' obligations under this Settlement Agreement and the Comprehensive Settlement Agreement.    The release executed by the Title Companies shall include an acknowledgement that the First Lien Title Policy, and any obligations, conditions and restrictions imposed thereunder upon Wilmington and the Insured Lenders who have executed releases in the form attached as Exhibit B-2, are terminated and cancelled as of the Effective Date. If requested by Wilmington, the Title Companies shall deliver original versions of their executed releases to Wilmington on the Effective Date. Notwithstanding anything else contained in Exhibit B-1 or herein, the Title Companies' execution of Exhibit B-1 shall not act as a bar or release of any claim for contribution or any other kind of cross-claim by any person (other than the Title Companies) against whom an action has been or may be brought with respect to the Fontainebleau Las Vegas Matters by or on behalf of the Title Companies, whether or not the Insured Lenders who obtain releases or Wilmington are a party in the other action or proceeding. For avoidance of doubt, such releases shall become effective only upon the occurrence of the Effective Date and satisfaction of the conditions precedent thereto, and shall exclude any obligations under this Settlement Agreement and the Comprehensive Settlement Agreement.

c.    On the Effective Date, and conditioned upon full satisfaction of the obligations of Wilmington and the Term Lender Group as set forth in Sections IV and V below and elsewhere under this Settlement Agreement and the Comprehensive Settlement Agreement, and conditioned upon the Title Companies' receipt of executed releases in the form attached as B-5 from Turnberry Ltd. and all parties named as defendants in the Title Companies Pending Soffer Litigation, the Title Companies shall execute and deliver copies of binding mutual releases in the form attached as Exhibit B-5, which releases all claims that have been asserted in the Title Companies Pending Soffer Litigation and dismiss those actions with prejudice (with the parties to those proceedings to bear their own respective fees and costs, provided that the fees and costs of Wilmington are subject to reimbursement in accordance with the Credit Agreement), subject to receiving delivery of executed copies of binding mutual releases in the form attached as

Exhibit B-5 from such defendants and Turnberry Ltd. In addition, the Title Companies shall dismiss without prejudice the pending Title Companies Pending Retail Litigation, subject to receipt by the Title Companies of a tolling agreement executed by FBR with terms acceptable to the Title Companies, and the agreement of FBR embodied in a stipulation of dismissal without prejudice that all parties shall bear their own fees and costs incurred through the date of such dismissal. For avoidance of doubt, any release or dismissal pursuant to this Section III.c shall not include any other claims asserted against TWC, FBR, Jeff Soffer or any other person or entity, including those asserted by the Term Lender Group in the Nevada state court proceeding, *Brigade Leveraged Capital Structures Fund, Ltd. v. Fontainebleau Resorts, LLC*, Case No.: A-11-637835-B (Nev. Dist. Ct.), and those asserted by any of the Title Company Parties in *Lawyers Title Insurance Corp., et al. v. Fontainebleau Resorts, LLC*, Case No.: 10-14719-CA-40, and related claims asserted by the Title Company Parties in the Bankruptcy Proceedings (collectively, the "Title Companies Retail Indemnity Claims"). Any such release shall contain language satisfactory to the Title Companies, Wilmington, the Term Lenders and the Trustee to preserve any claims held or asserted by those parties against FBR, TWC *et al.*, other than those claims which are expressly subject to release under this Section III.c. The effectiveness of the release attached hereto as Exhibit B-5 shall be deemed null and void if the Effective Date does not occur.

## IV.    Obligations of Term Lender Group and Wilmington

a.    The Term Lender Group shall direct Wilmington to execute this Settlement Agreement on or before the Execution Deadline Date. Upon its execution of this Settlement Agreement, Wilmington shall be bound by the obligations set forth herein. The Term Lender Group and Wilmington shall deliver copies of their executed signatures by the Execution Deadline Date to counsel for the Title Companies.

b.    By the Execution Deadline Date, the Represented Term Lenders and Wilmington shall execute and deliver copies of binding releases in the form attached as Exhibit B-2 and Exhibit B-4 to the Title Companies (for the benefit of their respective Title Company Parties) that have executed a release in the form attached as Exhibit B-1. The releases provided by the Represented Term Lenders and Wilmington shall exclude claims and defenses arising under or related to the Retail Title Policy and the Second Lien Title Policy. With respect to the representation and warranty to be provided under Section 1.4 of Exhibit B-2 and Section 1.3 of Exhibit B-4 to this Settlement Agreement: (i) any liability of an individual Lender to the Title Companies for damages caused by a breach of that representation and warranty shall, as to such Lender, be several and shall not exceed, as a percentage of the total liability to the Title Companies hereunder, such Lenders' pro rata ownership of Indebtedness under the Credit Agreement; (ii) the Title Companies shall be entitled to bring suit against any or all of Wilmington and the Lenders who provide such representation and warranty, without any obligation to join, in such lawsuit, Wilmington and every Lender who provide the representation and warranty; and (iii) Wilmington shall be entitled to contribution from, and shall be held harmless by the Term Lender Group for any and all damage, losses, claims, liabilities and related costs and expenses (including the fees, charges and disbursements of counsel) incurred by Wilmington for or arising in connection with any suit against Wilmington brought by the Title Companies, provided, that the liability of an individual member of the Term Lender Group to Wilmington for the contribution and hold harmless obligations hereunder shall be several and

shall not exceed, as a percentage of the total liability for the contribution and hold harmless obligations hereunder, the product of (x) such member's pro rata ownership of total Indebtedness held by the Term Lender Group, and (y) 1.2. The releases executed by the Represented Term Lenders and Wilmington shall include an acknowledgement that the First Lien Title Policy, and any obligations, conditions and restrictions imposed upon the Title Companies thereunder, are terminated and cancelled as of the Effective Date. Notwithstanding anything else contained in Exhibits B-2 and B-4 or herein, the execution of the release shall not act as a bar or release of any claim for contribution or any other kind of cross-claim by any person (other than the Term Lender Group or Wilmington) against whom an action has been or may be brought with respect to the Fontainebleau Las Vegas Matters by or on behalf of the Represented Term Lenders or Wilmington, whether or not the Title Companies are a party in the other action or proceeding. For avoidance of doubt, such releases shall become effective only upon the occurrence of the Effective Date and satisfaction of the conditions precedent thereto, including payment in full to the Trustee of the Settlement Funds, and shall exclude any obligations under this Settlement Agreement and the Comprehensive Settlement Agreement.

c.      Wilmington shall provide copies of this Settlement Agreement and any exhibits thereto to all Insured Lenders as promptly as reasonably practicable after the execution of this Settlement Agreement, and both Wilmington and the Term Lender Group shall request that, with the exception of First National Bank of Nevada, all Insured Lenders deliver copies of executed releases to the Title Company Parties in the form attached as Exhibit B-2 (and in the case of B of A, in the form attached as Exhibit B-3) by the Execution Deadline Date. For avoidance of doubt, unless waived in writing by the Title Companies, the delivery of copies of such executed releases from all Represented Term Lenders in favor of the Title Company Parties on or before the Execution Deadline Date is a condition precedent to the Effective Date and the Title Companies' obligations under this Settlement Agreement and the Comprehensive Settlement Agreement.

d.      In the event that the Represented Term Lenders or Wilmington obtain releases from other parties in connection with the settlement of the Title Companies Pending Soffer Litigation, mutual releases will be obtained for the Title Companies, subject to receiving mutual releases from the Title Companies. In the event that the Represented Term Lenders or Wilmington obtain releases from other parties in connection with the settlement of disputes related to the Fontainebleau Las Vegas Matters other than in connection with the Title Companies Pending Soffer Litigation, the Represented Term Lenders or Wilmington will request that such parties grant a release of the Title Company Parties.

e.      The Title Companies will be subrogated to $45 million of the allowed general unsecured deficiency claim of Wilmington on behalf of all Insured Lenders (the "Title Company Subrogation Claim") and shall share on a *pari-pasu, pro rata* basis with the allowed general unsecured deficiency claims of Wilmington on behalf of all Insured Lenders and other allowed general unsecured claims in any distribution to general unsecured creditors made by the estates of the Fontainebleau Las Vegas Debtors. Notwithstanding the preceding sentence: 1) any distribution of the proceeds by the Trustee to Wilmington under the Comprehensive Settlement Agreement in the amount of $88,909,559.26 shall not be subject to the Title Company Subrogation Claim; and 2) any distribution of proceeds to Wilmington from the Trustee Actions, whether or not subject to any lien of Wilmington, shall be subject to the Title Company

Subrogation Claim.    Wilmington shall, upon receipt of any distribution(s) from the Fontainebleau Las Vegas Debtors in connection with its unsecured deficiency claim, distribute to the Title Companies on account of the Title Company Subrogation Claim, their *pro rata* share of any allowed general unsecured deficiency claims distributed to Wilmington as soon as practicable at the same time such amounts are distributed to the Insured Lenders.    Other than Wilmington's duty to pay the Title Companies their *pari passu, pro rata* share of any distribution to the extent required under this Section IV.e, and their duties and obligations under this Settlement Agreement and the Comprehensive Settlement Agreement, neither Wilmington nor the Term Lender Group shall owe the Title Companies any duties or obligations in connection with the Credit Agreement or the Bankruptcy Proceedings, and the Title Companies shall take no action to limit, enjoin or otherwise impair the exercise by Wilmington or the Insured Lenders of any rights and remedies under the Credit Agreement, provided, that Wilmington shall have the exclusive right on behalf of the Insured Lenders to receive and distribute to Insured Lenders and the Title Companies any distribution(s) from the Fontainebleau Las Vegas Debtors on account of general unsecured claims.    The Title Companies shall not assert any other claim against the Fontainebleau Las Vegas Debtors other than claims filed based on the indemnity agreement which is the subject of Title Company Pending Retail Litigation, provided that the amount of any such claim shall not include fees and expenses incurred by the Title Companies prior to the Effective Date.    To the extent necessary, the Title Companies shall, conditioned upon and no later than five (5) business days after the Effective Date, withdraw with prejudice any such claims that have previously been asserted.

   f. Except for any execution of an Assignment & Assumption Agreement (as attached as an exhibit to the Credit Agreement), or any other sale, transfer or assignment of loans under the Credit Agreement, Wilmington, and the Term Lender Group represent and warrant that they have not sold, assigned, transferred or conveyed, in whole or in part, any claim, suit, demand or cause of action whether legal, equitable or statutory against the Title Companies or any combination thereof.

   g. Wilmington certifies that it has complied in all material respects with its obligations under the Credit Agreement to maintain records and that, based on the books and records maintained by Wilmington and the information provided by the hedge counterparties with respect to the hedge obligations, the schedule attached as Exhibit "A-1" identifies each of the term lenders, revolving lenders and hedge counterparties under the Credit Agreement as of September 16, 2013, and the principal amounts owed to each such entity under the Credit Agreement as of such date. By the Execution Deadline Date, Wilmington shall deliver to the Title Companies an updated version of Exhibit "A-1" reflecting any changes between September 16, 2013 and the Execution Deadline Date.

   h. Each member of the Term Lender Group certifies that the principal amount of Term Loans reflected on the signature page for each such member is true and correct. By the Execution Deadline Date, the Term Lender Group shall recertify that the principal amount of the Term Loans reflected on the signature page for each such member is true and correct as of the Execution Deadline Date.

     V.  **Bank of America Declaratory Judgment Action**
         <u>**Against Wilmington and Title Companies**</u>

The Term Lender Group, Wilmington and the Title Companies shall cooperate to seek: 1) a mutual release between the Title Company Parties and B of A, in the form attached as Exhibit B-3, which includes B of A's claims as an Insured Lender and former Administrative Agent under the Credit Agreement, any claims that the Title Companies might assert against B of A with respect to the Fontainebleau Las Vegas Matters, and all claims asserted in the B of A Declaratory Judgment Action; and 2) execution and delivery of a stipulation of dismissal with prejudice of the B of A Declaratory Judgment Action by the Execution Deadline Date, which shall be held in escrow by counsel for the Title Companies through the Effective Date. As set forth in Section VI below, the delivery of the Exhibit B-3 mutual release by B of A and the Title Companies and execution of the stipulation of dismissal with prejudice of the B of A Declaratory Judgment Action by all parties to such action are conditions precedent to the Effective Date and the Title Companies' obligations under this Settlement Agreement and the Comprehensive Settlement Agreement. The stipulation of dismissal shall be null, void and without effect if the Effective Date does not occur and/or if the Settlement Funds are not paid. If the Effective Date does occur, the Title Companies shall move for the entry of an order dismissing the B of A Declaratory Judgment Action with prejudice in accordance with the stipulation.

## VI.    Conditions Precedent to Effective Date of Settlement Agreement

a.    This Settlement Agreement shall become effective upon the Effective Date if each of the following conditions precedent has been satisfied in all respects: i) by the Execution Deadline Date, the Title Company Parties shall have received copies of the executed Settlement Agreement from Wilmington and the Term Lender Group, and executed releases from each Represented Term Lender in the form attached as Exhibit B-2, from B of A in the form attached as Exhibit B-3, from Wilmington in the form attached as Exhibit B-4, and from Turnberry Ltd. and the parties named as defendants in the Title Companies Pending Soffer Litigation in the form attached as Exhibit B-5, provided, that if the Title Companies have not received such executed copies of the Settlement Agreement or executed releases from all Represented Term Lenders, B of A and Wilmington on or before the Execution Deadline Date, the Title Companies shall have the right in their sole and absolute discretion to waive this condition precedent in writing no later than five business days after the Execution Deadline Date, and in the event the Title Companies fail to deliver such waiver in writing to Wilmington and the Term Lender Group (or such deadline is not extended by mutual written agreement, through counsel, of Wilmington, the Term Lender Group and the Title Companies), this Settlement Agreement shall automatically terminate in accordance with Section XII; ii) by the Execution Deadline Date, Wilmington and the Term Lender Group shall have received copies of the Settlement Agreement from the Title Companies, and Wilmington, the Represented Term Lenders, any other Insured Lender that has delivered an executed release to the Title Company Parties in the form attached as Exhibit B-2, and B of A shall have received copies of the executed releases from the Title Companies in the forms attached as Exhibit B-1 or B-3, as applicable; iii) by the Execution Deadline Date, the parties to the B of A Declaratory Judgment Action shall have executed and delivered to counsel for the Title Companies a stipulation for dismissal of the B of A Declaratory Judgment Action with prejudice; iv) the representations of Wilmington, the Term Lender Group and the Title Companies under this Settlement Agreement and the Comprehensive Settlement Agreement shall remain true in all material respects as of the Effective Date; v) there shall have been no breach by Wilmington, the Term Lender Group or the Title Companies of any of their

representations, warranties, covenants or obligations under this Settlement Agreement and the Comprehensive Settlement Agreement; vi) the Trustee shall have received payment in full of the Settlement Funds as required under Section III.a of this Settlement Agreement; vii) the Title Companies shall have complied with their obligations under Section III.c; viii) the Title Companies shall have received from Wilmington and the Term Lender Group by the Execution Deadline Date an updated version of Exhibits A-1 and A-2 reflecting any changes between September 16, 2013 and the Execution Deadline Date; ix) by the Execution Deadline Date, the Title Companies shall have received executed copies of stipulations for dismissal of the Titles Companies Pending Soffer Litigation with prejudice (with all parties to bear their own attorneys' fees and costs) from all parties named as defendants in the Title Companies Pending Soffer Litigation; x) by the Execution Deadline Date, in accordance with Section III.c, the Title Companies shall have received a tolling agreement and a stipulation of dismissal without prejudice executed by FBR concerning the Title Companies Pending Retail Litigation; and xi) all conditions to the Effective Date under Section 5.01 of the Comprehensive Settlement Agreement, have been fully satisfied.

       b.      Upon the Effective Date, the First Lien Title Policy, and any obligations, conditions and restrictions imposed thereunder upon the Title Companies, Wilmington and the Insured Lenders, shall be automatically terminated and cancelled.

### VII.      Exchange of Release Forms and Permanency of Releases

      The releases to be exchanged under this Settlement Agreement, including without limitation the cancellation and termination of the First Lien Title Policy and the release of claims under the First Lien Title Policy, shall remain binding and in full force and effect notwithstanding the entry of any subsequent order, judgment, or decree by any court, arbitration panel or other tribunal, avoiding or nullifying any transfers or transactions with respect to any of the parties or their successors or assigns, provided, that a released party shall not be entitled to the benefit of this Section VII if such released party receives, directly or indirectly, the cash or other proceeds of any such order, judgment or decree.

### VIII.      Confidentiality

      The parties and their counsel shall not issue a press release or otherwise publicly announce the terms of this Settlement Agreement, provided, that nothing herein shall preclude any party to the Comprehensive Settlement Agreement  from attaching this Settlement Agreement as an exhibit to the Joint Motion or Comprehensive Settlement Agreement to be publicly filed with the Bankruptcy Court, or otherwise referencing the terms of the Settlement Agreement in connection with any judicial proceedings. Notwithstanding the above, any publicly filed version of Exhibit "A-1" and Exhibit "A-2" to this Settlement Agreement shall redact any information disclosing the principal dollar amount of Loans or Hedge Obligations of any individual Lender under the Credit Agreement.

### IX.      Direction by Term Lender Group

      The Term Lender Group represents that it constitutes the Required Lenders (as such term is defined in the Credit Agreement) under the Credit Agreement.  The Term Lenders will direct

Wilmington to execute this Settlement Agreement simultaneously with the execution of this Settlement Agreement by the Term Lender Group and the Title Companies on or before the Execution Deadline Date.

## X.      Stay of Proceedings

Upon the execution of this Settlement Agreement, the parties shall exercise reasonable efforts to request, pending the Effective Date, a stay from the courts with respect to the Title Companies Pending Soffer Litigation and any proceedings in the Bankruptcy Proceedings as to which the Title Companies have assumed the obligation to pay defense costs, pending the Effective Date of this Settlement Agreement.  The obligations of the Title Companies to pay defense costs under the First Lien Title Policy shall terminate on the Effective Date, provided, that the Title Companies shall remain liable and responsible for any defense costs under the First Lien Title Policy that are incurred but not paid prior to the Effective Date (other than document depository costs accruing after August 1, 2013 in connection with the Priority Litigation which shall be paid out of the Icahn Sale Proceeds), subject to the right of the Title Companies to contest the reasonableness of the amount of such defense costs.

## XI.      Authority of Wilmington and Term Lender Group Regarding Separate Comprehensive Settlement Agreement

The Title Companies acknowledge that they have been informed that Wilmington and the Term Lender Group intend to execute, or have executed, the Comprehensive Settlement Agreement on substantially the terms contained in "Exhibit C" attached hereto , with, among other parties, Turnberry Residential Limited Partner, L.P. ("Turnberry"), Jeffrey Soffer, the Statutory Lienholders, the Trustee, and the Title Companies.  The Title Companies agree that they will not raise any objections or defenses to coverage under the First Lien Title Policy or otherwise based upon either the execution by Wilmington and the Term Lender Group of the Comprehensive Settlement Agreement, or any request made by any party (including the filing of any motion in the Bankruptcy Proceedings) seeking court approval of the Comprehensive Settlement Agreement.  Wilmington and the Term Lender Group agree that they shall not rely upon the execution of the Comprehensive Settlement Agreement, or the Title Companies' acknowledgements and agreements under this Section XI, in support of any claim asserted against the Title Companies under the First Lien Title Policy or otherwise.  Other than as expressly set forth herein, Wilmington, the Term Lender Group and the Title Companies reserve, and shall not be deemed to have waived, any rights, claims, and defenses under the First Lien Title Policy, the Second Lien Title Policy, or the Retail Title Policy, that may otherwise exist.

## XII.      Reservation of Rights

Subject to Sections XI and XIII of this Settlement Agreement, in the event the Effective Date does not occur or this Settlement Agreement is terminated, Wilmington, the Term Lender Group and the Title Companies reserve, and shall not be deemed to have waived, any rights, claims, and defenses, including under the First Lien Title Policy, the Retail Title Policy and the Second Lien Title Policy, that may otherwise exist.

## XIII.      Termination of Settlement Agreement

In the event of a termination of this Settlement Agreement prior to the Effective Date pursuant to Section VI above, the releases, assignments, and obligations of the parties under this Settlement Agreement shall be of no force and effect and the parties shall retain any rights, defenses and remedies that currently exist with respect to the First Lien Title Policy, the Second Lien Title Policy, the Retail Title Policy, the Title Companies Pending Soffer Litigation, the Bankruptcy Proceedings and otherwise, provided, that the agreements under Section XI shall survive the termination of this Settlement Agreement. The Title Companies, Wilmington and the Term Lender Group may, through counsel, mutually agree in writing to extend the deadlines in this Settlement Agreement.

### XIV.    **Miscellaneous**

a.    This Settlement Agreement and its Exhibits shall be attached as an Exhibit to the Comprehensive Settlement Agreement. In the event of any inconsistencies, the terms of this Settlement Agreement shall govern.

b.    All parties to this Settlement Agreement acknowledge that the terms and conditions set forth herein are the result of compromise, and none of the recitals, terms and provisions set forth herein shall be deemed or construed to be an admission of, or concession of, the validity of any claims or defenses raised by any party.

c.    The recitals and headings contained in this Settlement Agreement have been inserted for convenience only and in no way define or limit the scope or interpretation of this Settlement Agreement.

d.    This Settlement Agreement shall be governed by the laws of the State of Nevada without regard for its conflict of law rules.

e.    Any litigation arising out of, under, or in connection with, this Settlement Agreement shall be brought and maintained exclusively in the Bankruptcy Court. Each party hereunder irrevocably and unconditionally submits itself to the the Bankruptcy Court, and expressly waives the right to any other jurisdiction to which it may be entitled by reason of its present or future domicile or otherwise.

f.    Each individual or entity executing this Settlement Agreement in a representative capacity warrants and represents that he, she or it is authorized to enter into and execute this Settlement Agreement on behalf of his, her or its' respective principal, and that the appropriate corporate resolutions or other consents have been passed and/or obtained, granting such authority.

g.    The parties, and each of them, hereby acknowledge to each other that they have been represented by independent legal counsel of their own choice throughout all of the negotiations that preceded the execution of this Settlement Agreement, and that the Agreement has been executed on the advice of such independent counsel. Each party further acknowledges that the party and its counsel have had an adequate opportunity to make whatever investigation or inquiry that they may have deemed necessary to or desirable in connection with the subject